COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judges Elder, Frank, Humphreys, Kelsey, McClanahan, Haley, Petty,
           Beales, Powell and Alston
Argued at Richmond, Virginia


ANTHONY DALE CRAWFORD

                                                              OPINION BY
v.        Record No. 1194-07-2                      JUDGE ROBERT J. HUMPHREYS
                                                            DECEMBER 29, 2009
COMMONWEALTH OF VIRGINIA

                              UPON REHEARING EN BANC

            FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
                            Edward L. Hogshire, Judge

               Samantha Freed Bolton (Steven D. Rosenfield; Snook & Haughey,
               P.C., on briefs), for appellant.

               Leah A. Darron, Senior Assistant Attorney General (William C.
               Mims, Attorney General, on brief), for appellee.


                                    BACKGROUND[1]

        On Thursday, November 18, 2004, John and Irene Powers ("the Powers") had dinner

with their thirty-three-year-old daughter, Sarah Crawford ("Sarah") at a local restaurant in

Manassas, Virginia.  When they left the restaurant that night at about 8:30 pm, it would be the

last time that they would see their daughter alive.  Twelve hours later Sarah would be dead, and

her husband, the appellant, Anthony Dale Crawford ("Crawford") would be wanted for her

murder.

        The Powers had a "very close" relationship with their daughter and saw her frequently.

Sarah and her mother talked on the phone often.  During dinner, Sarah told her parents of the

_____

        [1] On appeal, we view the facts established at trial in the "light most favorable" to the
prevailing party below, in this case the Commonwealth, Commonwealth v. Hudson, 265 Va.
505, 514, 578 S.E.2d 781, 786 (2003), and we grant to that party all fair inferences flowing from
those facts.  Coleman v. Commonwealth, 52 Va. App. 19, 21, 660 S.E.2d 687, 688 (2008).

latest events in her life, including her job as an office manager for a television production company. Sarah mentioned to her mother that she had a hair appointment on Saturday and that, on Saturday afternoon, she had plans to go to a concert with a man she recently met. Sarah was, according to her mother, "really very happy" that night.

Sarah had every reason to be happy. She had a good job with a small, close-knit company that she enjoyed and found fulfilling. She had gastric bypass surgery in the summer of 2002 and reached her goal of losing one hundred and fifty pounds. In addition, Sarah had just gotten a raise and moved into her own apartment. And, most significantly, Sarah had recently decided to end her relationship with her abusive husband, Crawford.

Sarah and Crawford had been married since 1999, and had been together for several years before that. The couple had a troubled history, and Sarah was growing increasingly fearful of her husband. In October of 2004, Sarah and Crawford separated. Following their separation, Sarah expressed to a number of friends and co-workers that she was afraid that Crawford might physically harm her. This concern caused Sarah to make a number of significant changes in her life. Sarah found a new apartment in a rural area that her mother described as "wooded, desolate," and "well-hidden." Sarah chose the apartment because it had a long driveway, so that she could "make a phone call" or "get out" if she saw someone coming.

On October 29, 2004, Sarah and the Powers went to Crawford's apartment to pick up a few of Sarah's things.[2] Sarah tried to get Crawford tickets to a sporting event to get him out of the apartment because she was "afraid of an incident" arising from her move. However, Crawford was present in the apartment when Sarah and the Powers arrived. As Sarah expected, Crawford was hostile toward her, refused to allow her to take any of her belongings, and, ultimately, called the police. When the police arrived, they asked Crawford to calm down and to

_____

[2] Before they separated, Sarah shared the apartment with Crawford.

allow Sarah to take her things. However, despite the police officer's request, Crawford's hostile behavior toward Sarah continued. According to the police officer, as Sarah packed up her belongings, Crawford approached her and whispered something in her ear. The officer could not determine what Crawford said to Sarah, but the officer testified that "it was something that obviously upset [Sarah]," because she "immediately stood up and stepped back away from [Crawford]." Sarah then asked Crawford to repeat what he said and asked if Crawford was threatening her. The officer ordered Crawford to back away from Sarah; however, he had to repeat this command several times before Crawford complied. At one point, Mrs. Powers heard Crawford tell Sarah, "You'll pay for this."

Eventually, the police officers left the apartment, but, sensing that things might not remain peaceful, they remained nearby. After the officers left, Sarah mentioned that she wanted a side table that her parents had given her, and she asked Crawford to unlock the bedroom door so she could retrieve it. Instead of unlocking the door, Crawford said that he would get the table. Mr. Powers was packing up some of Sarah's belongings, when he heard Crawford say, "Here's your god-damned table" and the table "came flying over [Mr. Powers'] right shoulder and . . . landed near the sofa and broke . . . ." At that point, the Powers called the police and the same officers immediately responded. The police stayed until Sarah and her family finished packing her things, and then followed them for about a mile to make sure that they got away safely.

Following her encounter with Crawford at the apartment, Sarah went to the Prince William County Juvenile and Domestic Relations District Court (the "JDR court") and requested a preliminary protective order in order to prevent Crawford from having any further contact with her. In the affidavit for preliminary protective order (hereinafter "the affidavit"), which Sarah signed, she recounted past incidents in which Crawford forcibly raped her, threatened her life, and physically and verbally abused her. In the affidavit, Sarah also stated

> [o]n October 30, 2004, [Crawford] called me and told me that I must want to die. He also said he understands why husbands kill their wives. He told me that he would find me and would come to my work. . . . I am afraid of [Crawford]. I fear he may physically hurt me or even kill me. I want him to stay away from me and my family.

The JDR court granted Sarah's request for a preliminary protective order.[3] In the few weeks that the protective order was in effect, Sarah continued to have contact with Crawford. Telephone records revealed that Crawford and Sarah communicated on several occasions between November 1 and November 18, 2004. Sarah also paid for Crawford to attend a trade school in Kentucky.

As Sarah began to settle into her new life, she tried to take precautions for her own safety. Sarah chose the location of her desk at work because it overlooked the parking lot and allowed her to see if Crawford's vehicle was parked there. In addition, Sarah took a new route home every night after work. According to her supervisor, "[Sarah] would never go home the same way two days in a row because she didn't want someone to be able to follow her or know where she was going to be at any particular time, so she would always choose a new way." Sarah also spoke to her parents several times each day. On November 1, 2004, Sarah sought help from Acts Turning Points, a domestic violence intervention program in Prince William County.

On Thursday November 18, 2004, Sarah apparently sought to sever her last remaining ties with Crawford. On that day Sarah prepared a document that purported to release her father from any liability on the lease for the apartment that she previously shared with Crawford. Due to Crawford's credit problems, Mr. Powers co-signed the lease for their apartment. Sarah now

---

[3] The protective order prohibited Crawford from having any contact with his wife. At a court hearing on November 16, 2004, Sarah appeared in the JDR court and asked that the protective order be dismissed. The record does not establish why she made this request.

wanted her father's name removed from the lease. Because her printer was broken, Sarah asked one of her supervisors to print out the release form on his printer that afternoon. A copy of that release was later recovered from her supervisor's computer. Before Sarah left work on November 18, she informed her supervisor that she would be late the following morning, but she expected to be at the office by 1:00 p.m.

Sarah never made it to work on Friday, November 19, 2004. That morning, a hunter in Fauquier County found a box along the road that belonged to Sarah's employer. Sarah's supervisor testified that she was supposed to ship that box for him. The box had a small amount of Sarah's blood on it. Later that day, the Powers received a telephone call from a person who found Sarah's cell phone lying in the grass near his driveway in Manassas.[4] Worried for their daughter's well-being, the Powers made the first of several trips to Sarah's apartment that evening. When they arrived, Sarah and her car were gone, and the apartment was dark. The only sign of life in the apartment was Sarah's pet cat, which came to the glass door and cried.

On the morning of Saturday, November 20, 2004, the Powers went back to Sarah's apartment. Sarah's car was still missing, and her cat was still at the door, crying. Mrs. Powers called Sarah's salon to see if she had arrived at her hair appointment on Saturday morning and was told she had not. The Powers made the fifty-minute round trip from their home to Sarah's apartment three more times on Saturday. Each time they returned, Sarah's cat cried and clawed at the door. The last time the Powers went to Sarah's apartment on Saturday evening was around 8:00 p.m. They found a bottle of wine at the door with a note that said, "Sarah, sorry I missed you. Call me to let me know you're okay." Sarah had missed her Saturday afternoon date.

On Sunday, November 21, 2004, the Powers were finally able to reach Sarah's landlord, who let them into her apartment. The first thing the Powers noticed was that her cat had no food

---

[4] Records from Sarah's cell phone revealed that Sarah called Crawford twice on November 19, 2004, once at 7:52 a.m. and again at 8:51 a.m.

or water. The Powers had taken care of Sarah's cat when she had gone out of town before, and it was uncharacteristic for Sarah to leave her pet unattended and without food or water. After taking care of the cat, the Powers began looking around Sarah's apartment to try to determine what had happened. Mrs. Powers noted that all of Sarah's luggage was still in the apartment and that the clothes she had worn to dinner on Thursday were on the floor in front of her washing machine. Mrs. Powers went to Sarah's bedroom and noticed that there was a book open to page fifty-nine lying face down on Sarah's bedside table entitled, It's My Life Now: Starting Over After an Abusive Relationship or Domestic Violence.

In the early morning hours of November 22, 2004, the night manager of a motel in Charlottesville, Virginia found Sarah dead in one of the motel's rooms, her body positioned in a particularly gruesome and suggestive manner. Stripped naked, Sarah was placed on the bed in a "frog-like position." A motel towel concealed a fatal gunshot wound to the right side of her chest. An assistant chief medical examiner for the Commonwealth determined that the bullet passed through Sarah's right lung and severed her spinal cord, rendering Sarah paralyzed, unable to walk or struggle. The medical examiner testified that, without medical treatment, Sarah could have lived up to an hour following such an injury. Investigators found seminal fluid in Sarah's vagina and spermatozoa in Sarah's mouth and anus. DNA recovered from the seminal fluid matched that of Crawford. In addition, investigators found Crawford's clothing, personal belongings, and fingerprints in the motel room. Cigarette butts in the motel room's ashtray contained Crawford's DNA, and a pill bottle bearing Crawford's name was also found in the room. The motel's clerk testified that Crawford arrived at the motel at 11:00 a.m. on November

19, 2004. Crawford was driving Sarah's car at the time[5] and parked in the farthest spot from the front desk. Crawford told the clerk that he had been driving all night and asked for a quiet room, which he paid for with a $100 bill.

Given the abundance of evidence linking him to the murder scene, the Charlottesville police began to search for Crawford. As part of that investigation, the police contacted Crawford's relatives. Crawford's adult daughter, who lived in South Carolina, reported that her father had contacted her recently and asked her to wire him money. With this information, the police then learned that Crawford was staying with his extended family in Jacksonville, Florida.

The Charlottesville police informed their Jacksonville colleagues that they had reason to believe Crawford was in their area and that there was an outstanding warrant for his arrest for the murder of Sarah. The Charlottesville police also advised the Jacksonville authorities that Crawford was likely driving Sarah's car, a maroon Hyundai. The Jacksonville police located Crawford and arrested him; they also seized Sarah's car (which Crawford was driving at the time of his arrest) and sealed it for evidentiary purposes. The Charlottesville police later processed the car for evidence. The driver's window of the vehicle was broken, and police found Sarah's blood on both the driver's and rear seats. The police found gunshot residue in the car and a box of ammunition in the trunk.

Crawford waived his Miranda rights and made a statement to the Florida police during a custodial interview. The interview was videotaped, and the recording was admitted into evidence at trial. Crawford claimed that Sarah had picked him up early Friday morning at his house. He said they had planned to go to Charlottesville for the weekend to attempt to reconcile. After an hour to an hour and a half drive, they arrived in Charlottesville at about 8:30 in the

---

[5] Although characterized by the Powers and other witnesses as "Sarah's car," the evidence adduced at trial established that the vehicle Crawford was driving actually belonged to Mr. Powers.

morning.  Sarah was driving, and he was in the passenger's seat.  Crawford said they drove directly to a McDonalds and got breakfast.[6]  Without any explanation as to why, Crawford then stated that he pulled out his .38 revolver[7] planning to commit suicide.  Crawford said he had the gun cocked and his finger on the trigger when Sarah grabbed for the weapon.  While they were wrestling over the gun, it went off and the bullet hit Sarah.  Crawford claimed the shooting was an accident, telling the police "she basically did it to herself."

Crawford then said that he pulled Sarah into the back seat and drove to a nearby hotel and rented a room.  He left Sarah's body on the bed and her clothing in the room and "took off and headed south."  Significantly, Crawford never offered any explanation for leaving Sarah's body undressed in the position in which it was found, nor for failing to seek medical help for Sarah.  Likewise, he offered no explanation as to why his semen was found in her vagina and his sperm was found in her mouth and anus.[8]

Prior to trial, Crawford made a motion to suppress the affidavit executed by Sarah in support of the protective order, arguing that the document was testimonial hearsay and, therefore, inadmissible under Crawford v. Washington, 541 U.S. 36 (2004).  During the suppression hearing, the Commonwealth did not dispute that the affidavit was testimonial hearsay.  Instead, the Commonwealth argued that under the doctrine of forfeiture by wrongdoing, the trial court should find that Crawford forfeited his right to confrontation.  The trial court agreed with the

---

[6] The autopsy report, which was admitted into evidence, described the contents of Sarah's stomach as "a scant amount (20 cc) of thin yellow fluid."

[7] The police learned that on November 6, 2004, Crawford purchased a .38 Smith & Wesson revolver.  He later purchased a box of .38 caliber ammunition on November 13, 2004.  Although Crawford disposed of his revolver, police found a box of ammunition in his possession after Sarah was shot and killed.  Two cartridges were missing from the box.

[8] Appellant's brief states "[d]uring the course of their travel [from Manassas to Charlottesville] they engaged in consensual intercourse."  The record is totally devoid of any evidence to support this assertion.

Commonwealth and admitted a redacted copy of the affidavit on those grounds. A jury subsequently convicted Crawford of capital murder, abduction with intent to defile, rape, grand larceny, use of a firearm in the commission of a murder, and use of a firearm in the commission of abduction. Crawford appealed his convictions to this Court.

On appeal, Crawford contends that the trial court erred in (1) denying his motion to suppress an affidavit made by Sarah Crawford, which was submitted to the JDR court in conjunction with her application for a preliminary protective order[9] and (2) failing to grant his motion to strike the charges of abduction with intent to defile and rape, "since there was insufficient evidence to permit these issues to go to the jury."

On December 23, 2008, a divided panel of this Court reversed all of Crawford's convictions with the exception of his conviction for grand larceny. See Crawford v. Commonwealth, 53 Va. App. 138, 670 S.E.2d 15 (2008). The panel majority held that the trial court's admission of the affidavit violated Crawford's rights under the Confrontation Clause. The majority further held that the evidence was insufficient to support Crawford's convictions for rape, abduction with intent to defile, and use of a firearm in the commission of abduction. The majority also reversed Crawford's conviction for capital murder, since it reversed the convictions on which the capital murder charge was based. The panel dissent disagreed with the majority only in its sufficiency analysis as to the charge of abduction with intent to defile.

The Commonwealth petitioned the full Court for rehearing *en banc*, and on January 27, 2009, we granted the Commonwealth's petition and stayed the mandate of the panel opinion.[10]

---

[9] Because this issue before us involves only a constitutional question, we do not address the applicability of the rules of evidence with respect to the admissibility of the affidavit, either as a whole, or in redacted form.

[10] Crawford's brief contains a third question presented: "Did the trial court err in admitting non-testimonial statements of the decedent made to several friends and co-workers?" However, the Commonwealth's petition for rehearing *en banc*, which we granted in full, did not include this question presented. As counsel for Crawford conceded at oral argument, this issue is

For the following reasons, we disagree with Crawford and the analysis of both the panel majority and dissent, and we affirm Crawford's convictions.

ANALYSIS

I. The Confrontation Clause and the Admissibility of the Affidavit

In denying Crawford's motion to suppress the statements contained in the affidavit, the trial court found that Crawford "ha[d] forfeited his Sixth Amendment right to confront [Sarah's] testimony because he intentionally procured her unavailability to testify." In reaching this conclusion, the trial court stated that, "[t]o apply the forfeiture by wrongdoing doctrine, this [c]ourt must find by a preponderance of the evidence . . . that [Crawford] is responsible for [Sarah's] unavailability as a witness and therefore forfeited his right to assert the Confrontation Clause to suppress the statements contained in the affidavit[]."

Crawford contends that the trial court misapplied the "forfeiture by wrongdoing doctrine" and, therefore, under the United States Supreme Court's analysis in Crawford v. Washington, 541 U.S. 36 (2004), the trial court's admission of the challenged affidavit violated his rights under the Confrontation Clause of the Sixth Amendment. The Commonwealth responds that the trial court did not err in applying the forfeiture doctrine to the affidavit and also alternatively argues, for the first time on appeal, that the Confrontation Clause does not bar the admission of the affidavit because it is not "testimonial" in nature. Although we conclude that the trial court failed to make the factual findings required as a prerequisite for the application of the forfeiture by wrongdoing doctrine, we hold that the affidavit was admissible nonetheless.

"The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

---

not before this Court upon rehearing *en banc*. See Ferguson v. Commonwealth, 51 Va. App. 427, 658 S.E.2d 692 (2008). Therefore, we reinstate the mandate issued in connection with the panel opinion with respect to this issue.

- 10 -

him.'" Davis v. Washington, 547 U.S. 813, 821 (2006) (quoting U.S. Const. amend. VI). In

Crawford, the Supreme Court of the United States held that the Confrontation Clause barred "the

admission of testimonial statements of a witness who did not appear at trial unless he was

unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541

U.S. at 53-54. That said, the Supreme Court has acknowledged two common law exceptions to a

defendant's right of confrontation, which were well established and known to the framers of the

Sixth Amendment: dying declarations and forfeiture by wrongdoing. Id. at 56 n.6, 62.

While this appeal was pending, the Supreme Court decided Giles v. California, ___ U.S.

___, ___, 128 S. Ct. 2678, 2683 (2008).[11] In Giles, the Court discussed both the history and

applicability of the doctrine of forfeiture by wrongdoing as it pertains to a defendant's Sixth

Amendment right to confrontation. "Forfeiture by wrongdoing" is a common-law doctrine that

"permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the

'means or procurement' of the defendant." Id. at ___, 128 S. Ct. at 2683 (citations omitted). In

other words, where a defendant has caused a witness to be unavailable to testify, he forfeits his

constitutional right to confront that witness. After a careful and thorough examination of the

history of forfeiture by wrongdoing, the Supreme Court made clear in Giles that the doctrine

only applied "when the defendant engaged in conduct *designed* to prevent the witness from

testifying." Id. (emphasis in original). Thus, under the doctrine of forfeiture by wrongdoing,

"unconfronted testimony would *not* be admitted without a showing that the defendant intended to

prevent a witness from testifying." Id. at ___, 128 S. Ct. at 2684 (emphasis in original).

---

[11] Giles was a plurality opinion of the Supreme Court. Therefore, "'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" Marks v. United States, 430 U.S. 188, 193 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976)). By "join[ing] all but Part II-D-2 of [Justice Scalia's] opinion," Justices Souter and Ginsburg's concurrence provided a clear majority on the remaining portions of the opinion. Giles, __ U.S. at __, 128 S. Ct. at 2694 (Souter, J., concurring). Thus, Justice Scalia's opinion, minus Part II-D-2, constitutes the holding of Giles, as it is the narrowest position of at least five Justices concurring in the result.

Significantly, in that portion of Justice Scalia's opinion in <u>Giles</u> supported by a clear majority of the justices, the Supreme Court left open the possibility that a defendant's intention to prevent testimony might be inferred from the surrounding circumstances, such as in a case of ongoing domestic violence:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. *Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution--rendering her prior statements admissible under the forfeiture doctrine*. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

<u>Id.</u> at ___, 128 S. Ct. at 2693 (emphasis added). In his concurrence, Justice Souter expounded upon the Court's rationale with respect to situations of domestic violence.

> Examining the early cases and commentary, however, reveals two things that count in favor of the Court's understanding of forfeiture *when the evidence shows domestic abuse*. The first is the substantial indication that the Sixth Amendment was meant to require some degree of intent to thwart the judicial process before thinking it reasonable to hold the confrontation right forfeited; otherwise the right would in practical terms boil down to a measure of reliable hearsay, a view rejected in <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The second is the absence from the early material of any reason to doubt that the element of intention would normally be satisfied by the intent inferred on the part of the domestic abuser in the classic abusive relationship, which is meant to isolate the victim from outside help, including the aid of law enforcement and the judicial process. *If the evidence for admissibility shows a continuing relationship of this sort, it would make no sense to suggest that the oppressing defendant miraculously abandoned the dynamics of abuse the instant before he killed his victim, say in a fit of anger*.

<u>Id.</u> at ___, 128 S. Ct. at 2695 (Souter, J., concurring) (emphasis added).

- 12 -

In the case at bar, the Commonwealth presented no direct evidence that Crawford acted with the intent to prevent Sarah from testifying against him, nor did the trial court find that the circumstantial evidence of domestic abuse was sufficient to support an inference that Crawford intended to prevent Sarah from seeking redress for, or protection from, such abuse through the courts. By not considering Crawford's intent, the trial court incorrectly applied the forfeiture by wrongdoing doctrine, as it was defined in Giles. Thus, the trial court erred in its analysis for admitting the affidavit on that basis.

If this were the end of our analysis, we would remand this case back to the trial court for it to determine on retrial whether an intent on the part of Crawford "to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution" can be reasonably inferred from the facts and circumstances of the case.[12] Id. at ___, 128 S. Ct. at

---

[12] In Giles, the Supreme Court vacated the appellant's conviction and remanded the case "for further proceedings not inconsistent with [the] opinion." ___ U.S. at ___, 128 S. Ct. at 2693. Like Giles, the trial court in this case "did not consider the intent of [Crawford] because [it] found that irrelevant to application of the forfeiture doctrine. This view of the law was error, but the [trial] court is free to consider evidence of the defendant's intent on remand." Id.

Judge Elder's dissent takes the position that such a remand is unnecessary given the prosecutor's "concession" that the Commonwealth lacked evidence that Crawford killed Sarah for the sole purpose of preventing her from testifying against him. However, his position ignores the fact that the holding of Giles is that the forfeiture doctrine is broader than simply killing a witness to prevent that witness from testifying in a pending case. As noted above, Giles holds that the forfeiture doctrine also applies in domestic violence situations where there is evidence of "*the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution.*" Id. at ___, 128 S. Ct. at 2693 (emphasis added). As discussed more fully below, the prosecutor's statement can hardly be read to concede the lack of such intent given the record in this case.

Judge Elder's dissent also takes the position that the Commonwealth has "approbated and reprobated" by taking inconsistent positions at trial and on appeal. The context for our disagreement with Judge Elder on this point is the query from the trial court to the prosecutor that "the evidence is not likely to show that there was some proof of intent . . ." and "that it's a two-prong and not a three-prong test. Is that right?" The prosecutor's response is "That's correct, Your Honor . . . ." Judge Elder views the answer from the prosecutor as a concession by the Commonwealth that it lacks proof of Crawford's intent. However, it is equally as likely that the prosecutor simply agreed with the trial court as to the number of prongs in the test. In any event, even if the prosecutor's agreement with the trial court's statement is viewed as a concession that the Commonwealth cannot meet an evidentiary standard, it is not inconsistent

2693.  However, our analysis is not yet complete because, as the Commonwealth argues on brief, although the trial court admitted the affidavit based upon the applicability of the forfeiture by wrongdoing doctrine, another rationale for its admissibility is reflected in the record before us, and we find that rationale sufficient to affirm the decision of the trial court in admitting the affidavit.

In its ruling on Crawford's motion to suppress, the trial court found that the statements contained in the affidavit "do fall within the scope of <u>Crawford</u>."  The trial court reached this conclusion because, in <u>Crawford</u>, the Supreme Court specifically included affidavits in its non-exhaustive list of the types of testimonial statements.  541 U.S. at 51.  At the suppression hearing, the Commonwealth neither conceded nor disputed the trial court's analysis with respect to this issue.  However, on appeal, the Commonwealth explicitly takes the position that the

and/or contradictory for the Commonwealth to say in effect "We may not have evidence of intent, but we don't need it because it's not required."

Furthermore, the uniquely independent constitutional roles of the Attorney General and the Commonwealth's Attorney must be distinguished from each other.  As our Supreme Court has noted, because of this distinction, unlike other parties in a case on appeal, the Attorney General may expressly "repud[iate] the earlier position erroneously taken by the Commonwealth's Attorney . . . ."  <u>In re: Department of Corrections</u>, 222 Va. 454, 465, 281 S.E.2d 857, 863 (1981); <u>see also</u> <u>Cross v. Commonwealth</u>, 49 Va. App. 484, 494, 642 S.E.2d 763, 768 (2007).  Judge Elder's reliance on <u>In re: Commonwealth</u>, 278 Va. 1, 13, 677 S.E.2d 236, 241 (2009), is misplaced.  <u>In re: Commonwealth</u> was not a criminal appeal.  Therefore, the Commonwealth was not represented by the Attorney General, but rather by the Commonwealth's Attorney.  Our Supreme Court held that the Commonwealth was estopped because the Commonwealth's Attorney, the sole representative of the Commonwealth, took inconsistent positions before the trial court and on appeal.  Significantly, <u>In re: Commonwealth</u> in no way overrules or limits the Supreme Court's analysis in <u>In re: Department of Corrections</u>, which allows the Attorney General to repudiate a position previously taken by the Commonwealth's Attorney.

affidavit was not "testimonial," and thus, not "within the scope of Crawford."[13]  Initially, we note that the mere fact the Commonwealth did not dispute the testimonial character of the statements during the motion to suppress does not necessarily preclude us from addressing the issue on appeal.

> An appellate court cannot vacate a criminal conviction that violates no recognizable legal principle simply on the ground that the prosecutor (or, for that matter, the trial judge) did not articulate the proper legal basis for it.  Thus, an appellee may argue for the first time on appeal any legal ground in support of a judgment so long as it does not require new factual determinations, [Harris v. Commonwealth, 39 Va. App. 670, 676, 576 S.E.2d 228, 231 (2003) (*en banc*)], or involve an affirmative defense that must be "asserted in the pleadings," Eason v. Eason, 204 Va. 347, 352, 131 S.E.2d 280, 283 (1963), or serve as a subterfuge for a constitutionally prohibited cross-appeal in a criminal case, Hart v. Commonwealth, 221 Va. 283, 290, 269 S.E.2d 806, 811 (1980).

Blackman v. Commonwealth, 45 Va. App. 633, 642-43, 613 S.E.2d 460, 465 (2005);[14] see also

Wright v. Commonwealth, 278 Va. 754, 760 n.3, __ S.E.2d __, __ n.3 (2009) (noting that

---

[13] The record of the suppression hearing reflects that, following the argument of counsel for Crawford that the affidavit was testimonial and before hearing any argument in response from the Commonwealth, the trial court observed *sua sponte* that the affidavit was testimonial but arguably admissible under the forfeiture by wrongdoing doctrine.  The arguments of counsel then focused on whether that rationale applied.  The letter opinion of the trial court states that the Commonwealth "does not dispute" that the affidavit was testimonial.

[14] It is important to note that the decision before us on appeal is the trial court's decision to deny Crawford's motion to suppress and to admit the affidavit as *evidence*.  Because the trial court ruled in the Commonwealth's favor and admitted the affidavit, the Commonwealth had nothing to appeal.  Thus, contrary to the position of Judge Elder's dissent, this is not a situation where the Commonwealth is pursuing a constitutionally prohibited cross-appeal but rather, is simply a case of the prevailing party below raising an alternate basis for affirming the trial court, which we must consider if it is supported by the record in this case.  Furthermore, our consideration of whether the statements contained in the affidavit were of a testimonial character was squarely before the trial court and our resolution of this issue requires no additional fact-finding.  See Harris, 39 Va. App. at 676, 576 S.E.2d at 231 ("In addition, the proper application of this rule does not include those cases where, because the trial court has rejected the right reason or confined its decision to a specific ground, further factual resolution is needed before the right reason may be assigned to support the trial court's decision."); see also Commonwealth v. Shifflett, 257 Va. 34, 44, 510 S.E.2d 232, 237 (1999) ("[A]n appellate court ought to decide cases based on the record made in the court below.  The appellate court, in

"[a]lthough the record reflects that the Commonwealth apparently 'conceded' that the statute contained a nexus requirement, the issue is a question of law which is not subject to a concession binding on this Court"); Whitehead v. Commonwealth, 278 Va. 105, 677 S.E.2d 265 (2009), modified, No. 080775 (Oct. 22, 2009) (agreeing with our analysis of the right result wrong reason doctrine in Harris and Blackman); Logan v. Commonwealth, 47 Va. App. 168, 622 S.E.2d 771 (2005) (*en banc*).

The Confrontation Clause only applies to testimonial hearsay. That is because only those statements that are "testimonial" in nature "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." Davis, 547 U.S. at 821. Indeed, "[i]t is the *testimonial character* of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Id. (emphasis added). In explaining the distinction between testimonial and nontestimonial statements, the Supreme Court in Davis held as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, *and that the primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Id. at 822 (emphasis added). "[T]his holding necessarily implies that consciousness on the part of the person reporting an emergency (or the police officer eliciting information about the emergency) that his or her statements *might* be used as evidence in a crime does not lead to the

---

fairness to the trial judge, should not recast the evidence and put a different twist on a question that is at odds with the question presented to the trial court.").

conclusion *ipso facto* that the statement is testimonial." United States v. Ellis, 460 F.3d 920, 926 (7th Cir. 2006) (emphasis added).[15]

The statements at issue in this appeal are contained within an "Affidavit for Preliminary Protective Order." Although the Supreme Court of the United States recently stated that affidavits "fall within the 'core class of testimonial statements'" subject to the Confrontation Clause, we find it significant that the Court did not go as far as to hold that all affidavits are *per se* testimonial. Melendez-Diaz v. Massachusetts, ___ U.S. ___, ___, 129 S. Ct. 2527, 2532 (2009). In fact, neither Melendez-Diaz, nor any other case from the Supreme Court for that matter, has overruled or limited the applicability of the primary purpose test set forth in Davis. Lacking any further guidance on the matter from the Supreme Court, it becomes our task to attempt to reconcile the language in Davis with that in Melendez-Diaz and to determine whether the primary purpose test set forth in Davis is applicable to an affidavit unrelated to a criminal prosecution or whether conversely, any and all affidavits are *ipso facto* testimonial, irrespective of the primary purpose for their existence.[16]

Justice Scalia's majority opinion in Crawford makes it clear that the evil the Confrontation Clause was intended to prevent was the purposeful creation and use in a criminal case of an affidavit as a substitute for the live testimony of a witness, as he noted was the case in

---

[15] Both dissents take the position that because an affidavit for a protective order *might* be used in a criminal proceeding, all such affidavits are testimonial for Sixth Amendment purposes. Given that the gravamen of any contempt proceeding or misdemeanor prosecution for violation of a protective order is the violation of the order itself, it is difficult to conceive of any relevance to the use by the Commonwealth of the underlying affidavit but in any event, the dissents' speculation about *possible* future use in a criminal case is true of *any* out-of-court statement. Thus, the position of the dissents necessarily emasculates any primary purpose analysis under Davis.

[16] Affidavits may be, and often are, created for purposes unrelated to a criminal prosecution. For example, an affidavit of loss may be required by an insurance company as a prerequisite to process an insurance claim or required by a bank in order to replace a lost or stolen credit card, or may be required by law to obtain injunctive relief. See e.g. Code § 8.01-628; Code § 48-17.1.

the famous trial of Sir Walter Raleigh, and as was also the case in <u>Melendez-Diaz</u>.  After

carefully reviewing the holdings of <u>Crawford</u>, <u>Davis</u>, and <u>Melendez-Diaz</u>, we see no principled

reason to conclude that a hearsay statement obtained for a purpose *other than* criminal

prosecution should be treated differently with respect to the Confrontation Clause *solely* because

it takes the form of an affidavit.  Thus, the mere fact that the statements at issue in this case are

contained within an affidavit is not dispositive to our analysis, and we must still look to the

"primary purpose of the interrogation" to determine whether the statements are of a testimonial

or nontestimonial character.  <u>Davis</u>, 547 U.S. at 822.

It is undisputed that Sarah made the statements contained in the affidavit for the purpose

of obtaining a preliminary protective order[17] pursuant to Code § 16.1-253.1.  The statute

provides, in pertinent part, that:

> Upon the filing of a petition alleging that the petitioner is or has
> been, within a reasonable period of time, subjected to family
> abuse, the court may issue a preliminary protective order against
> an allegedly abusing person *in order to protect the health and
> safety of the petitioner . . . .*  The order may be issued in an ex parte
> proceeding upon good cause shown *when the petition is supported
> by an affidavit or sworn testimony* before the judge or intake
> officer.

Code § 16.1-253.1(A) (emphasis added).  From the plain language of the statute and as Judge

Elder's dissent acknowledges, it is clear that the *primary purpose* of the affidavit is not to initiate

or further a criminal prosecution, but rather "to protect the health and safety of the petitioner"

from an abuser by obtaining an *ex parte* preliminary protective order, a proceeding that is purely

civil in nature.  <u>Id.</u>[18]

---

[17] During oral argument, counsel for Crawford conceded that the primary purpose of the affidavit was not in furtherance of potential criminal prosecution but for the purpose of obtaining a protective order.

[18] In other constitutional contexts, the Supreme Court of the United States has noted that while the provisions of the Fifth and Sixth Amendments apply only to "criminal" matters, the labels "civil" and "criminal" are not dispositive.  "The critical features are the substance of the

Because the primary purpose of the affidavit was not to "prove past events potentially relevant to later criminal prosecution" but rather to obtain a civil, preliminary protective order, we hold that the statements contained therein were nontestimonial under Davis and, therefore, did not implicate Crawford's Sixth Amendment right to confrontation. 547 U.S. at 822. For that reason, the trial court's decision to admit the affidavit was not error.

## II. Abduction with Intent to Defile and Rape

Crawford further contends that the evidence adduced at trial was insufficient to sustain his convictions for abduction with intent to defile and rape. Specifically, Crawford asserts that, without the affidavit, the Commonwealth failed to exclude every reasonable hypothesis of his innocence. We disagree.

"[W]hen assessing the sufficiency of the evidence on appeal, 'we consider all admitted evidence, including illegally admitted evidence.'" Sprouse v. Commonwealth, 53 Va. App. 488, 493, 673 S.E.2d 481, 483 (2009) (quoting Hargraves v. Commonwealth, 37 Va. App. 299, 312-13, 557 S.E.2d 737, 743 (2002)). In this case, the jury found the evidence, *including the affidavit*, sufficient to sustain Crawford's convictions. Therefore, we must also consider the affidavit in our sufficiency analysis. However, during oral argument, counsel for Crawford

---

proceeding and the character of the relief that the proceeding will afford." Hicks v. Feiock, 485 U.S. 624, 625 (1988); see also Hudson v. United States, 522 U.S. 93 (1997).

As provided by Code § 16.1-253.1, the procedure for obtaining a protective order is an *ex parte* rather than an adversary proceeding and involves the restriction of conduct for the express and sole purpose of protection. Moreover, any sanction or punishment relates solely to the disobedience of the court order and not to any past conduct that might be reflected in the affidavit. In short, and contrary to the position of Judge Beales' dissent, the procedures used and the relief provided by the statute are in the nature of those used to obtain injunctive relief and thus are clearly civil in nature and not a criminal prosecution subject to the application of the Sixth Amendment. Other jurisdictions share this view of protective orders. See Katsenelenbogen v. Katsenelenbogen, 775 A.2d 1249, 1256 (Md. 2001) (observing that civil protection orders were not designed as "punishment for past conduct," but to "prevent further harm to the victim"); see also Cooke v. Naylor, 573 A.2d 376, 377 (Me. 1990) (noting that a protective order is historically an equitable remedy very similar to an injunction"); State ex rel. S.M., 719 So. 2d 445, 453 (La. 1998).

conceded that, if the affidavit were admissible, the evidence was sufficient to convict him of abduction with intent to defile and rape.

> [A]n appellant's concession of law [] qualifies either as a waiver for purposes of Rule 5A:18 or as an express withdrawal of an appellate challenge to a trial court judgment. In either scenario, we may accept the concession -- not as a basis for deciding the contested issue of law, but as a basis for not deciding it.

Logan, 47 Va. App. at 173 n.4, 622 S.E.2d at 773 n.4. Given Crawford's concession we need not address the issue any further and hold that the evidence is sufficient to sustain convictions for both charges. Thus, we affirm Crawford's convictions for abduction with intent to defile and rape.

CONCLUSION

For the foregoing reasons, we hold that the trial court incorrectly applied the forfeiture by wrongdoing doctrine because it did not consider whether Crawford acted with the intent to prevent Sarah from either testifying as a witness or seeking aid from the judicial process. However, because we hold that the statements contained in the affidavit were not testimonial under Davis, and thus, did not implicate Crawford's Sixth Amendment right to confrontation, the trial court's ultimate admission of the affidavit was not error. Finally, given counsel for Crawford's concession that, with the affidavit, the evidence is sufficient to sustain his convictions for abduction with intent to defile and rape, we hold that Crawford has waived his argument with respect to this issue. Therefore, we affirm all of Crawford's convictions.[19]

Affirmed.

---

[19] Because we affirm Crawford's convictions for abduction with intent to defile and rape, we also affirm his convictions for capital murder, use of a firearm in the commission of a murder, and use of a firearm in the commission of an abduction.

Elder, J., with whom Felton, C.J., joins, concurring, in part, and dissenting, in part.

I concur with the en banc majority's statement that, under the doctrine of forfeiture by wrongdoing, evidence which is testimonial may "'*not* be admitted without a showing that the defendant intended to prevent a witness from testifying.'" See supra at 12 (quoting Giles v. California, ___ U.S. ___, ___, 128 S. Ct. 2678, 2684, 171 L. Ed. 2d 488, 497 (2008)). I also concur in the majority opinion to the extent it holds that the trial court, "[b]y not considering [appellant's] intent, . . . incorrectly applied the forfeiture by wrongdoing doctrine, as it was defined in Giles." See supra at 13. However, this is where my agreement ends.

Further relying upon Giles, the majority concludes that,

> [i]f this were the end of our analysis, we would remand this case . . . to the trial court for it to determine on retrial whether an intent on the part of [appellant] 'to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution' can be reasonably inferred from the facts and circumstances of the case.

See id. (quoting Giles, ___ U.S. at ___, 128 S. Ct. at 2693, 171 L. Ed. 2d at 506). I believe the procedural history of this case, which stands in marked contrast to Giles, renders consideration of the issue of intent on remand improper.

The majority also concludes that the forfeiture-by-wrongdoing doctrine did not prevent admission of the affidavit because the affidavit was not testimonial under Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and its progeny. I continue to adhere to the view of the panel majority that whether the affidavit was testimonial for purposes of Confrontation Clause analysis is not before us on appeal. However, even if the issue of whether the affidavit is testimonial *is* properly before us, I believe controlling authority of the United States Supreme Court compels the conclusion that it is, in fact, testimonial. Because I believe the victim's affidavit was erroneously admitted and that its admission was harmless only with respect to appellant's conviction for grand larceny, I would reverse his convictions for

- 21 -

abduction with intent to defile, rape, capital murder, use of a firearm in the commission of

abduction, and use of a firearm in the commission of murder, and I would remand for retrial.

Thus, I respectfully dissent from the majority's affirmance of all of appellant's

convictions except grand larceny.

I.

A.

APPELLANT'S INTENT

Relying upon Giles, the majority concludes that if the affidavit were testimonial, the

appropriate course of action would be to remand "to the trial court for it to determine on retrial

whether an intent on the part of [appellant] 'to isolate the victim and to stop her from reporting

abuse to the authorities or cooperating with a criminal prosecution' can be reasonably inferred

from the facts and circumstances of the case." See supra at 13 (quoting Giles, ___ U.S. at ___,

128 S. Ct. at 2693, 171 L. Ed. 2d at 506). I believe the procedural history of this case, which

stands in marked contrast to Giles, renders consideration of the issue of intent on remand

improper.

In Giles, trial occurred *before* the United States Supreme Court's decision in Crawford v.

Washington. See People v. Giles, 152 P.3d 433, 437 (Cal. 2007). In Giles, "the issue of

forfeiture by wrongdoing was not litigated below," and "evidence of [the declarant's] hearsay

statements was admitted under a statutory hearsay exception that appeared to be valid at the time

[of the defendant's trial]." Id. (involving "a hearsay exception for out-of-court statements

describing the infliction of physical injury on the declarant when the declarant is unavailable to

testify at trial and the statements are trustworthy"). Although the forfeiture issue was not

litigated below, the California Court of Appeal nevertheless "addressed the forfeiture issue [in

Giles]," concluding the exception applied "because it was undisputed that [the declarant] was

unavailable to testify because of her death and that her death was the result of [the] defendant's

actions." Id. Thus, the People had no opportunity at trial to present evidence regarding whether the defendant killed the victim with the intent to prevent her from testifying.

In appellant's case, by contrast, appellant filed a pretrial motion *in limine* to exclude the affidavit, and the Commonwealth filed a written response in which it expressly argued the trial court should apply the forfeiture-by-wrongdoing exception to the hearsay rule to admit Mrs. Crawford's statements in the affidavit. The Commonwealth argued this exception did not require the trial court to find appellant had killed Mrs. Crawford to prevent her from testifying and instead required only a preliminary finding that appellant did kill her. Although the Commonwealth indicated during the motion hearing that it had "been talking with witnesses for months" and that "the last couple of weeks have been pretty in-depth," it did not aver in the alternative, either in its written response to the motion or its argument to the court, that it could offer evidence which would, in fact, support a finding that appellant killed Mrs. Crawford with the intent to prevent her from testifying against him.

The trial court articulated the dispute as being over whether the forfeiture-by-wrongdoing exception required proof of three elements—including proof that the defendant committed the charged crime with the intent to prevent the victim from testifying—or only two, not including this specific intent element. It then engaged in the following exchange with the Commonwealth:

> THE COURT: . . . First of all, do you agree that we'd
> have to have an evidentiary hearing? In other words, that at this
> stage of the proceedings . . . roughly two weeks before trial, that as
> a practical matter the way this matter will go forward assuming
> that the Court finds that . . . there's been sufficient evidence to
> show a wrongful taking of the life of the victim here. That would
> take place during the Commonwealth's case-in-chief and then
> there will be a point where the Commonwealth would rest and . . .
> the Court would have to rule on whether the motion in limine
> would be granted or not.
>
> [THE COMMONWEALTH]: Yes, Your Honor . . . .
>
> THE COURT: All right, and I take it, based on the proffer
> of evidence . . . from preliminary hearing and from the briefs, . . .

- 23 -

that the evidence is not likely to show that there was some proof of intent to keep the victim from testifying, per se. That . . . the Commonwealth's theory is that it was . . . a wrongful killing and that the Commonwealth believes it will be able to show by a preponderance, and that's all the Commonwealth needs to have[,] . . . that it's a two-prong and not a three-prong test. Is that right?

[THE COMMONWEALTH]: That's correct, Your Honor. . . .

Thus, the Commonwealth conceded it could not meet such an evidentiary standard if the court were to hold such a standard applied.

"A party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory." Cangiano v. LSH Bldg. Co., 271 Va. 171, 181, 623 S.E.2d 889, 895 (2006); see also Montague v. Commonwealth, 40 Va. App. 430, 438-39, 579 S.E.2d 667, 671 (2003) (applying this principle where the defendant conceded at trial that the license number on the vehicle he drove was the same as the license number of the stolen vehicle, thereby preventing him from arguing on appeal that the license numbers were different). "The Commonwealth[, like any other litigant,] will not be allowed to approbate and reprobate." In re: Commonwealth, 278 Va. 1, 13, 677 S.E.2d 236, 241 (2009) ("We will not permit the Commonwealth to ask the circuit court during the remanded hearing on mental retardation to exercise discretion and rule upon other legal issues but, inconsistently, assert in the mandamus proceeding that the circuit court lacked legal authority to do so.").

Because the Commonwealth conceded at trial that it could not establish appellant killed Mrs. Crawford to prevent her from testifying, it may not take a contrary position on remand. To the extent the Supreme Court's holding in In re: Department of Corrections, 222 Va. 454, 465, 281 S.E.2d 857, 862 (1981), allows the Attorney General to repudiate a factual concession believed to have been taken erroneously by the Commonwealth's Attorney in the trial court, this holding does not override the result I would reach in this case. The majority references this

- 24 -

portion of my analysis as averring that the Commonwealth approbates and reprobates "by taking inconsistent positions at trial and on appeal." See supra at 13 n.12. The majority, however, misconstrues my analysis. Whether or not the Attorney General, on appeal, disavows the Commonwealth's Attorney's position at trial, if this case is remanded to the trial court for additional findings of fact on the issue of intent, it is the Commonwealth's Attorney, not the Attorney General, who will be allowed to present evidence on an issue he has already conceded. This is precisely the sort of approbating and reprobating the Supreme Court held in In re: Commonwealth that *the Commonwealth's Attorney* will not be permitted to engage in.

Further, the majority implies that the Court in Giles created a whole new test for establishing forfeiture by wrongdoing in the domestic context. See id. I disagree. As the majority articulates in the text prior to that footnote, the Supreme Court indicated merely that "in a case of ongoing domestic violence," "a defendant's intention to prevent testimony might be inferred from the surrounding circumstances." See supra at 12. Under well established principles, in *any* case in which proof of intent is required, intent may and often must be established with circumstantial evidence, and evidence probative of that intent may include the accused's statements and conduct, see, e.g., Howard v. Commonwealth, 207 Va. 222, 228, 148 S.E.2d 800, 804 (1966) (citing Merritt v. Commonwealth, 164 Va. 653, 662, 180 S.E. 395, 399 (1935)), including prior bad acts of the accused toward the victim, see, e.g., Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970). Thus, the Court's discussion in Giles of the fact that intent supporting admissibility may be proved with evidence of "[e]arlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help" or "evidence of ongoing criminal proceedings at which the victim would have been expected to testify" hardly breaks new legal ground.

In any event, because the majority concludes the affidavit was not testimonial and, thus, that it was properly admitted *regardless* of whether appellant killed Mrs. Crawford with the

intention of preventing her from testifying against him, the majority's rationale regarding how the Commonwealth *might* go about proving a defendant in a domestic violence case intended to prevent a witness from testifying in order to invoke the forfeiture-by-wrongdoing doctrine is dictum.

B.

TESTIMONIAL NATURE OF THE AFFIDAVIT

1.  Whether the affidavit contains testimonial hearsay is not before us in this appeal.

The trial court held the affidavit was testimonial but that its admission did not violate the Confrontation Clause because the forfeiture-by-wrongdoing doctrine applied. The Commonwealth had no right to appeal the ruling that the affidavit was testimonial, and it would have had no right to appeal even if the trial court had excluded the affidavit on the grounds appellant alleged. Code § 19.2-398, which governs the Commonwealth's right of appeal, provides in relevant part as follows:

> A. In a felony case a pretrial appeal from a circuit court may be taken by the Commonwealth from:
>
> 1.  An order of a circuit court dismissing a warrant, information or indictment, or any count or charge thereof on the ground that (i) the defendant was deprived of a speedy trial in violation of the provisions of the Sixth Amendment to the Constitution of the United States, Article I, Section 8 of the Constitution of Virginia, or § 19.2-243; or (ii) the defendant would be twice placed in jeopardy in violation of the provisions of the Fifth Amendment to the Constitution of the United States or Article I, Section 8 of the Constitution of Virginia; or
>
> 2.  An order of a circuit court prohibiting the use of certain evidence at trial on the grounds such evidence was obtained in violation of the provisions of the Fourth, Fifth or Sixth Amendments to the Constitution of the United States or Article I, Section 8, 10 or 11 of the Constitution of Virginia prohibiting illegal searches and seizures and protecting rights against self-incrimination, provided the Commonwealth certifies that the appeal is not taken for purpose of delay and that the evidence is substantial proof of a fact material in the proceeding.

- 26 -

B.  A petition for appeal may be taken by the Commonwealth in a felony case from any order of release on conditions pursuant to Article 1 (§ 19.2-119 *et seq.*) of Chapter 9 of this title.

C.  A petition for appeal may be taken by the Commonwealth in a felony case after conviction where the sentence imposed by the circuit court is contrary to mandatory sentencing or restitution terms required by statute.

D.  Nothing in this chapter shall affect the Commonwealth's right to appeal in civil matters or cases involving a violation of law relating to the state revenue or appeals pursuant to § 17.1-411 or subsection C of § 19.2-317.

E.  A pretrial appeal may be taken in any criminal case from an order of a circuit court dismissing a warrant, information, summons, delinquency petition, or indictment, or any count or charge thereof, on the ground that a statute or local ordinance on which the order is based is unconstitutional.

Manifestly, subsections (A)(1), (B), (C), (D) and (E) would not apply to permit an appeal of a ruling that admission of the affidavit the victim completed to accompany her earlier protective order request violated appellant's Confrontation Clause rights.  Further, subsection (A)(2) applies only to evidence alleged to have been "*obtained* in violation of the provisions of the Fourth, Fifth or Sixth Amendments to the Constitution of the United States or Article I, Section 8, 10 or 11 of the Constitution of Virginia *prohibiting illegal searches and seizures and protecting rights against self-incrimination*."  Code § 19.2-398(A)(2) (emphases added); see Commonwealth v. Hawkins, 10 Va. App. 41, 43-44, 390 S.E.2d 3, 4-5 (1990) (interpreting the statute to hold that all appeals under the subsection (A)(2) language are limited to "those involving illegal searches and seizures and violations of rights against self-incrimination").  Here, there is no allegation that the victim's protective order affidavit was "*obtained*" in a way delineated in the statute.

Thus, the Commonwealth lacked the right to ask this Court to revisit that issue in appellant's appeal because to do so would "serve as a subterfuge for a constitutionally prohibited

cross-appeal." See White v. Commonwealth, 37 Va. App. 658, 665, 561 S.E.2d 12, 16 (2002) (noting that although we may, under appropriate circumstances, "affirm the decision of the trial court when it has reached the right result for the wrong reason[,] . . . 'the Commonwealth cannot use [this principle] as a subterfuge for a constitutionally prohibited cross-appeal'" (quoting Driscoll v. Commonwealth, 14 Va. App. 449, 452, 417 S.E.2d 312, 313 (1992))); see also Hart v. Commonwealth, 221 Va. 283, 289-90, 269 S.E.2d 806, 810-11 (1980).

2.  Even if we properly may consider the nature of the affidavit, its contents are testimonial.

Even if we were not bound by the trial court's ruling regarding the nature of the affidavit's contents, the Supreme Court's pronouncements in this area compel the conclusion that the statements in the affidavit are, in fact, testimonial hearsay. The majority's reliance on the "primary purpose" language in Davis v. Washington, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), is flawed, as a careful analysis of the Supreme Court's decisions in Crawford, Davis, and Melendez-Diaz v. Massachusetts, ___ U.S. ___, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), reveals.

In Crawford, the Court noted the existence of "[v]arious formulations of th[e] core class of 'testimonial' statements":

> "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," White v. Illinois, 502 U.S. 346, 365[, 112 S. Ct. 736, 747, 116 L. Ed. 2d 848, 865] (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 3.

Crawford, 541 U.S. at 51-52, 124 S. Ct. at 1364, 158 L. Ed. 2d at 193.  Declining to adopt a

specific definition, the Court held that "[r]egardless of the precise articulation, some statements qualify under any definition," and it gave as examples "ex parte testimony at a preliminary hearing," "before a grand jury, or at a former trial," and "[s]tatements taken by police officers in the course of interrogations." Id. at 52, 68, 124 S. Ct. at 1364, 1374, 158 L. Ed. 2d at 193, 203. It noted that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 51, 124 S. Ct. at 1364, 158 L. Ed. 2d at 192.

In Davis, the Court distinguished between types of statements *made to law enforcement officers*. It held that answers to questions posed by law enforcement officers for the purpose of addressing an ongoing emergency during a 911 call were non-testimonial, whereas answers to questions given "when the circumstances objectively indicate that there is no such ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" are testimonial. 547 U.S. at 822, 126 S. Ct. at 2273-74, 165 L. Ed. 2d at 237. It noted it did not hold "that statements made in the absence of any interrogation are necessarily nontestimonial" because "[t]he Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation." Id. at 822 n.1, 126 S. Ct. at 2274 n.1, 165 L. Ed. 2d at 237 n.1. In support of this assertion, it cited the fact that part of the evidence used to prosecute Sir Walter Raleigh for treason, and which served as part of the impetus for reform, was a letter from his alleged accomplice, Lord Cobham, "which was plainly *not* the result of sustained questioning." Id.; see Crawford, 541 U.S. at 44, 124 S. Ct. at 1360, 158 L. Ed. 2d at 188. It noted that

> [m]ost of the American cases applying the Confrontation Clause or
> its state constitutional or common-law counterparts involved
> testimonial statements of the most formal sort—sworn testimony in
> prior judicial proceedings or formal depositions under oath—
> which invites the argument that the scope of the Clause is limited

- 29 -

to that very formal category[,] [b]ut [that] the English cases that were the progenitors of the Confrontation Clause did not limit the exclusionary rule to prior court testimony and formal depositions.

Davis, 547 U.S. at 826, 126 S. Ct. at 2275-76, 165 L. Ed. 2d at 239. Finally, it observed,

The question before us in Davis, then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements. When we said in Crawford, [541 U.S.] at 53[, 124 S. Ct. at 1365, 158 L. Ed. 2d at 194], that "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial. It is, in the terms of the 1828 American dictionary quoted in Crawford, "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" 541 U.S.[] at 51[, 124 S. Ct. at 1364, 158 L. Ed. 2d at 192].

Id. at 826, 126 S. Ct. at 2276, 165 L. Ed. 2d at 239-40.

Davis in no way purported to narrow the definition of "testimonial" provided in Crawford and specifically stated it did *not* reach the issue of "whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" Id. at 823 n.2, 126 S. Ct. at 2274 n.2, 165 L. Ed. 2d at 238 n.2. Thus, Davis unequivocally does not stand for the proposition that a prior statement, regardless of its form, nature or context, is testimonial only upon proof that its "primary purpose" was "to establish or prove past events potentially relevant to a later criminal prosecution." 547 U.S. at 822, 126 S. Ct. at 2274, 165 L. Ed. 2d at 237.

Most recently, in Melendez-Diaz, the Court considered the character, for Confrontation Clause purposes, of "statements" not made in response to any sort of direct police questioning— those contained in a certificate "reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." In the course of holding the certificate at issue contained testimony subject to the requirements of the

Confrontation Clause, the Court provided clarification concerning what types of statements are testimonial. ___ U.S. at ___, 129 S. Ct. at 2531-32, 174 L. Ed. 2d at 321. It quoted the three "formulations of this core class of testimonial statements" it had recited in Crawford. Id. at ___, 129 S. Ct. at 2531, 174 L. Ed. 2d at 321. The Court had noted in Crawford that these descriptions "share[d] a common nucleus and then define[d] the Clause's coverage at various levels of abstraction around it," but it declined in Crawford to adopt one test over the others. 541 U.S. at 51-52, 124 S. Ct. at 1364, 158 L. Ed. 2d at 193.

In Melendez-Diaz, however, the Court quoted *all three tests* as "describ[ing] the class of testimonial statements covered by the Confrontation Clause" and held "[t]here is little doubt that the documents at issue [here] fall within the 'core class of testimonial statements' thus described" because "the description of that category mentions affidavits twice." ___ U.S. at ___, 129 S. Ct. at 2532, 174 L. Ed. 2d at 321; see id. at ___, 129 S. Ct. at 2543, 174 L. Ed. 2d at 333 (Thomas, J., concurring in part and concurring in the judgment) (writing separately to note his continued adherence to the position that the Confrontation Clause is implicated by extrajudicial statements "only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions" and opining that the certificates of analysis "at issue in this case 'are quite plainly affidavits'" under this definition). Thus, among the core class of testimonial statements covered by the Confrontation Clause, the Court in Melendez-Diaz included "'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,'" without requiring any separate showing that these materials were prepared in anticipation that they were likely to be used prosecutorially. Id. at ___, 129 S. Ct. at 2531-32, 174 L. Ed. 2d at 321 (quoting Crawford, 541 U.S. at 51-52, 124 S. Ct. at 1364, 158 L. Ed. 2d at 193). It held that although the documents at issue were "denominated . . . 'certificates'" by the relevant state law, they were

- 31 -

quite plainly affidavits: "declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths[,]" Black's Law Dictionary 62 (8th ed. 2004)[,] . . . "'made for the purpose of establishing or proving some fact[,]'" Crawford, [541 U.S.] at 51[, 124 S. Ct. at 1364, 158 L. Ed. 2d at 192] (quoting 2 N. Webster, An American Dictionary of the English Language (1828)).

Id.

The Court made the following additional observations but did *not* hold that such proof was *required* to establish the certificates of analysis were testimonial:

Here, *moreover*, not only were the affidavits "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" Crawford, [541 U.S.] at 52, [124 S. Ct. at 1364, 158 L. Ed. 2d at 193], but under Massachusetts law the *sole purpose* of the affidavits was to provide "prima facie evidence of the composition, quality, and the net weight" of the analyzed substance.

In short, under our decision in Crawford the analysts' affidavits were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment.

Id. at ___, 129 S. Ct. at 2532, 174 L. Ed. 2d at 321-22 (citation omitted) (first emphasis added); see id. at ___, 129 S. Ct. at 2543, 174 L. Ed. 2d at 333 (Thomas, J., concurring in part and concurring in the judgment).

In sum, when the document at issue is an "'extrajudicial statement[] . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony or confessions,'" a majority of the Court has not required proof that the "declarant[] would reasonably expect [the statement] to be used prosecutorially" or would reasonably expect "the statement would be available for use at a later trial." Id. at ___, 129 S. Ct. at 2532, 174 L. Ed. 2d at 321 (quoting Crawford, 541 U.S. at 51-52, 124 S. Ct. at 1364, 158 L. Ed. 2d at 193); id. at ___, 129 S. Ct. at 2543, 174 L. Ed. 2d at 333 (Thomas, J., concurring in part and concurring in the judgment). Such knowledge is inherent in the nature of making a sworn statement, thereby

obviating the need for separate proof. Here, the affidavit Mrs. Crawford signed under oath was testimonial under this definition.

Even under a narrower definition, Mrs. Crawford was "[a]n accuser who [made] a formal statement [about appellant] to [a] government officer[]" and, thus, "[bore] testimony" against him. See Crawford, 541 U.S. at 51, 124 S. Ct. at 1364, 158 L. Ed. 2d at 192. She completed the affidavit to support her request for a protective order against appellant, her alleged domestic abuser. Because the affidavit was a sworn statement designed to protect Mrs. Crawford from her husband's potentially criminal harassment, it is clear that the declarant, Mrs. Crawford, would reasonably expect the statement would be "potentially relevant to [and available for use in a] later criminal prosecution" on the subject if one should arise. See Davis, 547 U.S. at 822, 126 S. Ct. at 2274, 165 L. Ed. 2d at 237.

Contrary to the majority's claim, a proceeding for a protective order is not wholly or even primarily civil. As the majority recognizes, although the Confrontation Clause "appl[ies] only to 'criminal' matters," the United States Supreme Court has held in other contexts that "the labels 'civil' and 'criminal' are not dispositive." See supra at 19 n.18. As the majority also recognizes, "'[t]he critical features are the substance of the proceeding and the character of the relief that the proceeding will afford.'" See id. (quoting Hicks v. Feiock, 485 U.S. 624, 632, 108 S. Ct. 1423, 1429, 99 L. Ed. 2d 721, 731 (1988)). Although the procedure for obtaining a preliminary protective order is ex parte and focuses on protecting the person who sought the order, this does not compel the conclusion that the order is purely civil or injunctive in nature. Pursuant to the statutory scheme, violation of a protective order is punishable as contempt. Contempt may be civil or criminal:

> "The distinction between refusing to do an act commanded, -- remedied by imprisonment until the party performs the required act; and doing an act forbidden, -- punished by imprisonment for a definite term; is sound in principle, and generally, if not universally, affords a test by which to determine the character of

- 33 -

the punishment." Gompers [v. Buck Stove & Range Co.], 221 U.S. [418,] 443[, 31 S. Ct. 492, 499, 55 L. Ed. 797, 807 (1911)].

Hicks, 485 U.S. at 632, 108 S. Ct. at 1430, 99 L. Ed. 2d at 732. Because a protective order, by its very nature, *forbids* certain conduct, the punishment for violating it most closely resembles criminal contempt. Further reinforcing this inference is that, pursuant to the express terms of the statutory scheme, once a protective order has been issued and served on the party against whom it was entered, any violation of the order subjects the party *both* to liability for contempt of court *and* to the explicit "penalty" of being found "guilty of [at least] a Class 1 misdemeanor." Code §§ 16.1-253.1, -253.2 (also providing heightened "punishment[s]" for repeat offenses where the original or subsequent offense "was based on an act or threat of violence").

Finally, even assuming characterization of the proceeding as civil is proper, the affidavit alleged appellant committed numerous serious criminal offenses against Mrs. Crawford, including "forcibly rap[ing] her, threaten[ing] her life, and physically and verbally abus[ing] her." See supra at 3-4. Thus, when Mrs. Crawford executed the affidavit, she clearly was an accuser making a formal testimonial statement to the government officer who entered the order within the meaning of the Confrontation Clause, even if the primary purpose of the order was an attempt to protect her from future harm caused by appellant rather than to punish appellant for past behavior.

## C.

## HARMLESS ERROR

Because I would conclude the trial court committed constitutional error by admitting Mrs. Crawford's affidavit to prove the truth of its contents, I would also consider whether the introduction of this evidence affected the jury's decision, i.e., if this error was harmless. For the reasons set out in Part II(A)(2) of the panel majority in this case, see Crawford v. Commonwealth, 53 Va. App. 138, 152-62, 670 S.E.2d 15, 22-26 (2008), I would conclude the

erroneous admission of this evidence was harmless only as to appellant's conviction for grand

larceny and was not harmless as to his remaining convictions, thereby requiring their reversal

and remand for retrial.[20]

## II.

In sum, I concur in the en banc majority opinion only to the extent it holds the trial court

incorrectly applied the forfeiture-by-wrongdoing doctrine because it did not require a showing

that appellant intended to prevent the victim from testifying against him.  Based on the principle

that a party may not approbate and reprobate, I would hold the Commonwealth is bound by its

concessions at trial that appellant did not kill the victim to prevent her from testifying and may

not seek to prove otherwise on remand.  I would also hold that controlling precedent of the

United States Supreme Court compels the conclusion, as the trial court held, that the affidavit

was testimonial.  Thus, I would hold the trial court's admission of the affidavit violated the

Confrontation Clause.  Finally, I would conclude that this erroneous admission was not harmless

---

[20] Appellant also challenges the sufficiency of the evidence to support his convictions for rape and abduction with intent to defile.  If an appellate court concludes the evidence *including* any improperly admitted evidence is insufficient to support a defendant's convictions, remand for retrial on those charges violates double jeopardy principles.  See Hargraves v. Commonwealth, 37 Va. App. 299, 312-13, 557 S.E.2d 737, 743 (2002); Parsons v. Commonwealth, 32 Va. App. 576, 581, 529 S.E.2d 810, 812-13 (2000).  In appellant's case, I conducted this double jeopardy analysis on behalf of the panel majority, which held the evidence *including* the affidavit was insufficient to support appellant's convictions for rape and abduction with intent to defile.  Crawford, 53 Va. App. at 155-57, 160-61, 670 S.E.2d at 23-24, 26.  As a result, the panel majority held that dismissal of these indictments and the indictments which depended upon them—capital murder and use of a firearm in the commission of abduction—was required.  Id.

Despite this analysis at the panel stage, counsel for appellant took the position in oral argument on rehearing en banc that the evidence *including* the affidavit is, in fact, sufficient to prove rape and abduction with intent to defile.  Because appellant conceded the legal sufficiency of the evidence on this point, I conclude remand is appropriate without reaching the issue regarding whether double jeopardy principles would require dismissal of these indictments.  See Logan v. Commonwealth, 47 Va. App. 168, 172 n.4, 622 S.E.2d 771, 773 n.4 (2005) (en banc) (reasoning that where an appellate court accepts a concession on a legal issue, that concession provides "not . . . a basis for deciding [the earlier] contested issue of law, but . . . a basis for *not* deciding it" (emphasis added)).

except as to appellant's grand larceny conviction, thereby requiring reversal of his other convictions and remand for retrial in a proceeding in which the affidavit is not admitted. Thus, I respectfully dissent.

Beales, J., with whom Alston, J., joins, concurring, in part, and dissenting, in part.

The facts presented in this appeal are tragic and disturbing, as the majority opinion aptly describes. However, disturbing as they are, we, nevertheless, as judges on this Court, are required, of course, to follow the binding precedent of the United States Supreme Court and the Supreme Court of Virginia, and, therefore, we must determine whether this case, despite the fact of a tragic killing, also presents legal error of a constitutional nature. After reviewing the relevant law, I find that I must reach a different conclusion than the majority opinion on several issues in the analysis of this case, although I also would ultimately conclude that most of appellant's convictions should be affirmed.

## I. The Affidavit

The majority opinion finds that the trial prosecutor "neither conceded nor disputed" the trial court's, and appellant's, position that Mrs. Crawford's affidavit was testimonial hearsay and that, even if the prosecutor did concede that the affidavit was testimonial, he was wrong. I must disagree with both of these positions.

### A. The Commonwealth's Concession and Right Result/Wrong Reason

The majority opinion states, "[T]he Commonwealth neither conceded nor disputed the trial court's analysis" on the issue of testimonial hearsay. I disagree. An analysis of the record in this case clearly establishes that the Commonwealth conceded this point, even if the prosecutor did not take the ultimate step and explicitly state that he agreed with appellant's characterization of the evidence as testimonial hearsay. Therefore, because of the facts the trial court found (and did not find) and presumed in reaching this legal conclusion, I do not believe this case presents an appropriate situation for the application of the "right result/wrong reason" doctrine. See Whitehead v. Commonwealth, 278 Va. 105, 115, 677 S.E.2d 265, 270 (2009), modified, No. 080775 (Oct. 22, 2009).

- 37 -

Appellant filed a written motion *in limine*, asking the trial court to exclude the 2004 affidavit that Mrs. Crawford filed with the JDR court as part of a preliminary protective order petition.  He argued that the document was testimonial and that its introduction into evidence would violate the Confrontation Clause.  The motion also asked that the trial court exclude other "non-testimonial" statements that the Commonwealth intended to introduce at trial.  The Commonwealth filed a written response to this motion, which labeled the affidavits "testimonial."  In its response to appellant's arguments about the affidavit, the Commonwealth argued *only* that the affidavit was admissible under the "Forfeiture by Wrongdoing" doctrine, which the Supreme Court mentioned in Crawford v. Washington, 541 U.S. 36, 62 (2004), as an exception to the Confrontation Clause's requirements for the handling of *testimonial* hearsay.  The Commonwealth's response also addressed, in a separate section, appellant's request to exclude what both the Commonwealth and appellant described as various "non-testimonial" statements.

At the beginning of the hearing on appellant's motion *in limine*, the trial court acknowledged receipt of briefs by the parties and stated, "I have read the briefs."  Thus, the trial court clearly knew before the oral argument had even begun that the Commonwealth had consistently described the affidavit as "testimonial."  During his argument, appellant's counsel said that he did not "see in the Commonwealth's response that there's any disagreement that those statements are, in fact, testimonial."  Appellant's counsel then proceeded to explain why the two-pronged forfeiture by wrongdoing doctrine advocated by the Commonwealth was not applicable here.  When the prosecutor interrupted to ask if only the affidavit was under discussion at that moment, the court answered, "I think we're all agreeing that the testimonial part of it is what he's arguing at the moment."

When the prosecutor began his argument, the prosecutor agreed that the evidence would not show "some proof of intent to keep the victim from testifying, per se," asking the court to

apply a "two-pronged," rather than the traditional "three-pronged" forfeiture by wrongdoing doctrine. At the conclusion of the argument, appellant and the trial court discussed whether the state-of-mind exception to the general prohibition on the introduction of hearsay might allow the presentation of the affidavit to the jury for some limited purposes.

Eight days later, the trial court issued a letter opinion that, *inter alia*, denied appellant's motion *in limine* to exclude the 2004 affidavit. In this letter, the court noted, "there is much confusion in the courts over the scope of the testimonial category of hearsay," but Crawford v. Washington lists affidavits as an example of a type of testimonial statement. The court concluded, "[I]t is clear, and the Commonwealth does not dispute, that these statements do fall within the scope of Crawford." The trial court then used the two-pronged forfeiture by wrongdoing doctrine advocated by the Commonwealth to rule that the affidavit was admissible for the truth of the matters asserted therein.

Given these proceedings, I believe that we must conclude that the Commonwealth conceded to appellant's, and the trial court's, characterization of the affidavit as testimonial hearsay. The prosecutor never argued that the affidavit was non-testimonial. Instead, he opted to argue that an exception to the Confrontation Clause applied, an exception that was relevant *only* if the affidavit was *testimonial*. Indeed, the Commonwealth's response to the motion *in limine* labeled the affidavit "testimonial" and never called it "nontestimonial," yet the response did discuss other statements that it labeled "nontestimonial." As a result, the Commonwealth had the burden at trial to establish an exception that would allow the jury to hear the evidence, given the Confrontation Clause's bar on the use of testimonial hearsay in criminal trials. The Commonwealth at trial relied on only one exception – a two-pronged forfeiture by wrongdoing doctrine. The trial court applied that doctrine as advocated by the Commonwealth and admitted the affidavit under what it believed to be an exception to the Confrontation Clause, an exception later struck down by the Supreme Court in Giles v. California, __ U.S. __, 128 S. Ct. 2678

- 39 -

(2008). In short, the trial court here took the very action recommended by the Commonwealth, applying the two-pronged forfeiture by wrongdoing doctrine in the exact manner advocated by the prosecutor in both his briefing and his oral argument.

Given this posture and the fact finding that the trial court did and did not make in reaching this conclusion, I must respectfully disagree with the majority opinion's application of the "right result/wrong reason" doctrine to this case. I would find that this doctrine does not apply here.

The Supreme Court of Virginia recently noted with approval the following explanation of this doctrine:

> An appellate court may affirm the judgment of a trial court when it has reached the right result for the wrong reason. However,
>
>> [t]he rule does not always apply. . . . [T]he proper application of this rule does not include those cases where, because the trial court has rejected the right reason or confined its decision to a specific ground, further factual resolution is needed before the right reason may be assigned to support the trial court's decision.
>
> Harris v. Commonwealth, 39 Va. App. 670, 675-676, 576 S.E.2d 228, 231 (2003), Blackman v. Commonwealth, 45 Va. App. 633, 642-643, 613 S.E.2d 460, 465 (2005) ("an appellee may argue for the first time on appeal any legal ground in support of a judgment so long as it does not require new factual determinations.") We agree with these holdings by the Court of Appeals.

Whitehead, 278 Va. at 115, 677 S.E.2d at 270. Here, I would find that the doctrine should not be applied because additional facts, beyond those that the trial court was asked to consider, must be reviewed in order to determine whether Mrs. Crawford's affidavit was non-testimonial hearsay. Therefore, I believe that the majority opinion errs in its consideration of the Commonwealth's new argument – that the affidavit is non-testimonial hearsay – on appeal.

- 40 -

The trial court rejected the grounds now advocated by the Commonwealth on appeal. As the majority points out, the trial court explicitly found that the affidavit was testimonial hearsay. In doing so, the trial court implicitly rejected any factual findings upon which to base an argument that the affidavit was non-testimonial hearsay. The trial court was never asked to make any explicit findings of fact or consider the evidence regarding the creation or "primary purpose" of the affidavit, as the Commonwealth did not object to the characterization of the affidavit as testimonial hearsay. No evidence was specifically presented to address this issue. In addition, the evidence that was before the trial court, such as the fact that the affidavit was given under oath, supported the trial court's finding that the affidavit was testimonial hearsay especially in light of the fact that the Commonwealth did not object to that finding. Thus, the right result/wrong reason analysis cannot be applied here, as the trial court rejected the argument that the evidence is non-testimonial hearsay and implicitly rejected factual findings that are necessary to conclude that the affidavit was non-testimonial hearsay.[21]

The majority opinion concedes that at least some affidavits are testimonial hearsay, but then attempts to distinguish affidavits that are not testimonial from those affidavits that are testimonial by arguing that the Court must examine the "primary purpose" for the creation of the document. However, the majority opinion fails to acknowledge that, in determining the "primary purpose" for the creation of the affidavit, the Court must consider *the evidence and the facts surrounding the creation of the affidavit* in order to establish such a purpose. Although the legal question of whether evidence is inadmissible testimonial hearsay may be reviewed *de novo*, as the majority opinion contends, the question presented in this case requires that various facts be determined to support the majority opinion's assertion that "the primary purpose of the affidavit was not to 'prove past events potentially relevant to later criminal prosecution.'"

---

[21] The Commonwealth does not argue that the affidavit is admissible under some other evidence rule or exception to the Confrontation Clause's bar on testimonial hearsay.

I believe that the primary purpose of the affidavit can only be discovered by examining the factual situation surrounding the creation of the affidavit. Here, the trial court found that the document at issue was an affidavit, but the trial court did not consider (and was not asked to consider) any evidence or circumstances regarding the creation of the affidavit. "[C]ases in which the party seeking affirmance failed to present the argument in the trial court, such that the trial court did not have an opportunity to rule on the argument, are not 'proper cases' for the application" of the "right result/wrong reason" doctrine. Whitehead, 278 Va. at 114, 677 S.E.2d at 270 (citing Eason v. Eason, 204 Va. 347, 352, 131 S.E.2d 280, 283 (1963)). Pursuant to the Supreme Court's instructions in Whitehead, therefore, this Court should not apply the "right result/wrong reason" doctrine here, as addressing this question necessarily requires consideration of facts and evidence that were not presented to the trial court and upon which the trial court was never actually asked to rule. See Blackman, 45 Va. App. at 642-43, 613 S.E.2d at 465; see also Commonwealth v. Shifflett, 257 Va. 34, 44, 510 S.E.2d 232, 237 (1999) (noting that appellate courts should not "recast" evidence to support an argument that was not made at trial).

In a footnote, the majority claims that appellant conceded during oral argument that the primary purpose for the affidavit was obtaining a protective order. I have two concerns with this basis for the majority opinion's assumption that no new facts or evidence need be considered in applying the "right result/wrong reason" doctrine. First, the Commonwealth conceded the opposite position at trial when it effectively agreed with appellant that the affidavit was testimonial hearsay. Second, at oral argument, when asked by the Court sitting *en banc* whether appellant was "willing to concede" that the primary purpose for the affidavit was not a criminal prosecution, appellant's counsel responded, "That's not necessarily the case. We don't know whether or not there may have been further, if the affidavit was to have been used in a further . . . ." At this point, appellant's counsel was asked another question by the Court, one suggesting that the burden of proof regarding the primary purpose fell on appellant as the person who

- 42 -

appealed this case. Appellant's counsel then essentially conceded that the evidence, such as it existed in the record, established only that the affidavit was created in order to obtain the protective order. However, appellant was not asked to concede, and did not concede, that no new factual findings or additional evidence from outside the record were necessary to consider whether the trial court had reached the right result, but for the wrong reason. Cf. Whitehead, 278 Va. at 115, 677 S.E.2d at 270 ("Because the Commonwealth limited its method of proof at trial, Whitehead was not on notice to present evidence to rebut any other method of proof possible.").

Because the trial court rejected the position now presented by the Commonwealth – that the affidavit was not testimonial – *and* because the trial court was not asked to make and did not explicitly make any factual findings that would support the Commonwealth's new position on appeal, I would find that this appeal does not present an appropriate situation in which to apply the "right result/wrong reason" doctrine. This Court, therefore, should assume that the affidavit is testimonial hearsay.[22]

---

[22] It is interesting to note that the United States Supreme Court in Giles, which also considered the admissibility of an affidavit under the two-pronged forfeiture by wrongdoing doctrine, "accept[ed] without deciding" the concession that the affidavit was testimonial. Giles, __ U.S. at __, 128 S. Ct. at 2682.

B.  Testimonial Hearsay

While I do not believe it is appropriate for this Court to address the Commonwealth's argument presented in this appeal, now claiming that the affidavit was actually non-testimonial hearsay, for the reasons stated *supra*, I find that I must address this issue because I believe that the majority opinion incorrectly concludes that the affidavit here is not testimonial hearsay. Based on the law as established by the United States Supreme Court, I must agree with the trial court, with appellant, and with the trial prosecutor that this affidavit is testimonial hearsay.

1.  The Definition of Testimonial Hearsay

The United States Supreme Court explained in Crawford v. Washington:

> The text of the Confrontation Clause reflects this focus.  It applies to "witnesses" against the accused—in other words, those who "bear testimony."  2 N. Webster, An American Dictionary of the English Language (1828).  "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Ibid.  *An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.*  The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

541 U.S. at 51 (brackets in originial) (emphasis added).  The Court listed "[v]arious formulations of this core class of 'testimonial' statements," including affidavits, in that list.  Id.

Two years later, the Supreme Court refined the definition of testimonial hearsay in Davis v. Washington, 547 U.S. 813 (2006), which consolidated two criminal cases – Davis's and Hershel Hammon's.  The Supreme Court found that the statement presented at Davis's trial was not testimonial hearsay, but the affidavit presented at Hammon's trial was testimonial.  Id. at 828, 834.  In comparing these two fact patterns, the Supreme Court developed a refinement of Crawford that is particularly relevant here, although it is overlooked by the majority opinion.

The statement involved in Davis's case was a recording of a 911 call.  Michelle McCottry informed the 911 operator that Davis was assaulting her, and the operator began asking

- 44 -

McCottry questions.  Id. at 817-18.  The statement in Hammon's case was an affidavit filled out by his wife at the request of the police after they arrived to investigate a reported assault.  Id. at 819-20.  As the Supreme Court explained, the question presented by these convictions was "which police interrogations produce testimony."  Id.  The Court then answered this question:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows:  Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Id. at 822 (footnote omitted).

The Court also explained in a footnote that "the absence of any interrogation" will not automatically define a statement as non-testimonial.  Id. at 822 n.1.  The Supreme Court noted in its discussion of Davis's case that most cases applying the Confrontation Clause "involved testimonial statements of the most formal sort – sworn testimony in prior judicial proceedings or formal depositions under oath," but concluded that "the English cases that were the progenitors of the Confrontation Clause did not limit the exclusionary rule to prior court testimony and formal depositions."  Id. at 826.

In considering the particular facts of Davis's case, the Court noted as important the fact that McCottry faced "an ongoing emergency" and that the operator's questions were necessary to resolve that emergency.  Id. at 827.  The Court then found that McCottry

> simply was not acting as a *witness*; she was not *testifying*.  What she said was not "a weaker substitute for live testimony" at trial, United States v. Inadi, 475 U.S. 387, 394, 106 S. Ct. 1121 (1986), like Lord Cobham's statements in Raleigh's Case, 2 How. St. Tr. 1 (1603), or Jane Dingler's *ex parte* statements against her husband in King v. Dingler, 2 Leach 561, 168 Eng. Rep. 383 (1791), or

- 45 -

Sylvia Crawford's statement in Crawford [v. Washington]. In each of those cases, the *ex parte* actors and the evidentiary products of the *ex parte* communication aligned perfectly with their courtroom analogues. McCottry's emergency statement does not. No "witness" goes into court to proclaim an emergency and seek help.

Id. at 828. The Court found McCottry's statements to the 911 operator were not testimonial, but it also noted that later parts of the conversation might indeed be testimonial hearsay, but those later statements were not the subject of the appeal. Id. at 828-29.

The Supreme Court found Amy Hammon's statement presented "a much easier task," given the ruling in Crawford v. Washington. Id. at 829. The Court explained:

What we called the "striking resemblance" of the Crawford statement to civil-law *ex parte* examinations, 541 U.S., at 52, 124 S. Ct. 1354, 158 L. Ed. 2d 177, is shared by Amy's statement here. Both declarants were actively separated from the defendant— officers forcibly prevented Hershel [Hammon] from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

Id. at 830. The Court also pointed out, in comparing the Davis and Hammon statements, that

The statements in Davis were taken when McCottry was alone, not only unprotected by police (as Amy Hammon was protected), but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. McCottry's present-tense statements showed immediacy; Amy's narrative of past events was delivered at some remove in time from the danger she described.

Id. at 831-32.

## 2. Mrs. Crawford's Affidavit

The affidavit here is certainly more similar to the affidavit in Hammon's case than to the statements to the 911 operator in Davis's case. Both Mrs. Crawford's and Amy Hammon's statements were made after the emergency had passed, unlike McCottry's statement. Both Mrs. Crawford's and Amy Hammon's statements were in the form of an affidavit made without the presence of the accused, whereas McCottry's statement was made while defendant was actually present. Both Mrs. Crawford's and Amy Hammon's statements described past criminal behavior, while McCottry's statement described events as they were occurring. In addition, the affidavit here was specifically prepared for presentation in a courtroom, as was the affidavit in Melendez-Diaz v. Massachusetts, ___ U.S. ___, 129 S. Ct. 2527, 2532 (2009), which was also found to violate the Confrontation Clause.

The majority argues that the affidavit here was part of a civil proceeding and that, therefore, it was not intended for "prosecution" and cannot be testimonial, pointing to the "primary purpose" language in Davis. However, this position ignores the context of the Supreme Court's "primary purpose" language. As the discussion above illustrates, the Supreme Court was comparing two specific examples of hearsay, one in which the declarant clearly was not concerned about future prosecution, but instead was concerned about an immediate emergency. In the contrasted case involving Hammon, the statement was given to police officers, but the record does not indicate that it was prepared with the understanding that the statement would be presented at trial. The Supreme Court stated that if the primary purpose is "to enable police assistance to meet an ongoing emergency," 547 U.S. at 822, then the statement is not testimonial. Nothing in the record here indicates that Mrs. Crawford was under assault when she signed the affidavit. Therefore, her affidavit clearly does not fall into the non-testimonial category under this part of the Davis test. However, the Supreme Court also indicated that, if no ongoing emergency existed and "the primary purpose of the interrogation is to establish or prove past

events potentially relevant to later criminal prosecution," then the statement is testimonial. Mrs. Crawford's affidavit clearly falls into this category.[23]

Mrs. Crawford apparently gave her affidavit, at minimum, to obtain a preliminary protective order, under Code § 16.1-253.1. The preliminary protective order that was issued indicates that, as part of an *ex parte* proceeding, the affidavit was presented to the court. The affidavit itself is typed on a sheet of paper with "31st Judicial District" and "Juvenile and Domestic Relations Court" printed at the top. The record does not indicate who typed the order or if the intake officer who notarized the affidavit asked questions of Mrs. Crawford to elicit the information. However, the affidavit is very organized and clearly is not a stream-of-consciousness statement like McCottry's statement in Davis.

In the affidavit, Mrs. Crawford made a formal statement to prove that past criminal acts had occurred – exactly the type of statement that Crawford v. Washington and Davis prohibit as admission of testimonial hearsay.[24] Although not all of the alleged acts taken by appellant contained in the affidavit are criminal, most of the acts clearly are criminal and "potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822. The incidents include battery (possibly malicious wounding), rape, destruction of private property, assault, and harassing telephone calls, all acts that are criminal under the Virginia Code. See Code §§ 18.2-51

---

[23] I believe that the following analysis discussing the facts regarding creation of the affidavit should have and would have been conducted by the trial court, with testimony or proffers to support these evidentiary findings, if this issue had been contested by the Commonwealth. An appellate court should *review* this type of evidentiary analysis, not conduct it. However, as the majority opinion has determined that we should address this issue, I feel obligated to address the flaws that I find in that analysis, to the extent that I can, based on the record before us.

[24] Even in protective order proceedings, such affidavits are admitted only as evidence to allow the issuance of a 14-day preliminary protective order. For a permanent protective order (which lasts for two years in Virginia), the court must conduct a full hearing with the respondent present (or at least noticed) so that he or she can hear the evidence and defend against it. See Code § 16.1-253.1(B); Tsai v. Commonwealth, 51 Va. App. 649, 659 S.E.2d 594 (2008).

(malicious wounding); 18.2-57 (assault and/or battery); 18.2-57.2 (assault and battery on a family member); 18.2-61 (rape); 18.2-137 (destruction of private property); 18.2-429 (calling with the intent to annoy). The affidavit also indicates that, the day before she signed the document, Mrs. Crawford spoke to a policeman about her problems with appellant and that the policeman "gave [her] several safety tips and told [her] to get a Protective Order."[25]  In addition, under Code § 16.1-253.1, the affidavit's clear "primary purpose" was to prove past events so that the court would have sufficient evidence to issue a preliminary protective order.

The affidavit was explicitly prepared for presentation to a judge as part of an *ex parte* proceeding to obtain a protective order. It was an *explicit substitute for testimony*, the exact type of evidence excluded by the Confrontation Clause. Pursuant to Code § 16.1-253.1, Mrs. Crawford's affidavit in support of a protective order petition needed to establish that she had been subjected to "family abuse," which includes "any act involving violence, force, or threat including, but not limited to, any forceful detention, which results in bodily injury or places one in reasonable apprehension of bodily injury." Code § 16.1-228. Once a preliminary protective order here was granted, appellant faced conviction, at minimum, of a Class 1 misdemeanor for having any contact with his wife. See Code § 16.1-253.2 (listing the penalties for violation of a protective order, ranging from a Class 1 misdemeanor to a Class 6 felony). To say that such a proceeding is "entirely civil in nature" and effect, as the majority opinion does, is simply not

---

[25] In this case, we do not know the circumstances surrounding the creation of Mrs. Crawford's affidavit. We do not know the functions or motivations of the "intake officer" who notarized the affidavit, and, therefore, we cannot compare this person's purposes to the purposes of a police officer or a 911 operator, or someone else, a consideration that the United States Supreme Court addressed in Davis. 547 U.S. at 822. Therefore, it is very difficult to determine the "primary purpose" of the affidavit from the intake officer's perspective. However, as the trial court found that the affidavit was testimonial, and the Commonwealth at trial conceded that the affidavit was testimonial hearsay, this Court should conclude the trial court made all appropriate factual findings to support that conclusion. See Harris v. Commonwealth, 133 Va. 700, 705, 112 S.E. 753, 754 (1922) ("The ruling[s] of the trial court are presumed to be correct, unless the contrary appears from the record.").

accurate. While all the due process protections of a criminal proceeding do not apply to petitions for a protective order, obtaining a protective order requires that the petitioner establish "family abuse" and, once granted, a protective order allows an individual to use the criminal law to enforce and prosecute a violation of that order. Code § 16.1-253.2 (establishing criminal penalties for protective order violations). Therefore, for all of the reasons stated *supra*, I cannot conclude, as the majority opinion does, that the affidavit here – submitted to a JDR court as part of a petition for the issuance of a protective order – was not created in expectation of future use in court and was not "potentially relevant" to possible future criminal proceedings. See Davis, 547 U.S. at 822.

I would find that the prosecutor conceded that the affidavit was testimonial, which would include conceding any factual basis for finding that the affidavit was testimonial. Therefore, I believe this Court should not second-guess the trial court's finding that the affidavit was testimonial. And, even if, as the majority contends, this Court can address the question of whether the affidavit is testimonial, I would continue to disagree with the majority and would find that the affidavit must be testimonial, given the United States Supreme Court's analysis and holdings in Crawford v. Washington and in Davis.

Thus, I would find that it was constitutional error for the trial court to admit the affidavit into evidence for the truth of the matter stated therein. The two-pronged forfeiture by wrongdoing doctrine, which the Commonwealth advocated at trial and initially on appeal, is not an exception that would allow admission of the affidavit in this particular case – although the trial court did not have the benefit of reading the United States Supreme Court's decision in Giles prior to its ruling because this decision was not handed down until after appellant's trial had concluded. See Giles, ___ U.S. at ___, 128 S. Ct. at 2683-88 (discussing the two-pronged version of forfeiture by wrongdoing and finding that this version of the doctrine is not an

- 50 -

exception to the Confrontation Clause that permits introduction of testimonial hearsay at criminal trial).[26]

## II. Harmless Error

Although I would find the trial court erred in admitting the affidavit for the truth of the matters asserted therein, I would conclude that this error was harmless, except in the case of the rape conviction. Thus, I concur with the final holding of the majority opinion that affirms all of the convictions here, with the exception of the holding regarding the rape conviction, from which I respectfully dissent.

> The Supreme Court, in Chapman v. California, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." As the Supreme Court stated in Delaware v. Van Arsdall, 475 U.S. 673, 681, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986), "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." See Neder v. United States, 527 U.S. 1, 119 S. Ct. 1827, 1837, 144 L. Ed. 2d 35 (1999).

> A court, when determining whether federal constitutional error is harmless, must consider several factors, including the importance of the tainted evidence in the prosecution's case, whether the evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and, of course, the overall strength of the prosecution's case.

Dearing v. Commonwealth, 259 Va. 117, 123, 524 S.E.2d 121, 124-25 (2000). In short, the Commonwealth bears the burden of proving that any constitutional error is harmless beyond a

---

[26] As the majority notes, the trial court here did not consider and was not asked to consider the third prong of the "traditional" forfeiture by wrongdoing doctrine – appellant's intent to prevent the declarant from testifying. See Giles, __ U.S. at ___, 128 S. Ct. at 2684. The applicability of that doctrine was never advocated by the Commonwealth in this case, at any level of these proceedings.

reasonable doubt. See Chapman, 386 U.S. at 24; Joyner v. Commonwealth, 192 Va. 471, 477, 65 S.E.2d 555, 558-59 (1951).

Appellant admitted that he shot Mrs. Crawford, but he claimed it was an accident. He told the police that he was attempting to kill himself while they were in Mrs. Crawford's car. Mrs. Crawford supposedly reached for the gun, and it went off accidentally. The blood patterns in the car suggest that Mrs. Crawford was sitting in the driver's seat and that someone sitting in the passenger's seat shot her. Appellant also admitted that he then took his wife to the motel and left her there.

The affidavit was admitted to prove that appellant was violent towards Mrs. Crawford, rebutting his claim that he shot her accidentally. The affidavit described one incident in which appellant threw her against a door and also threw a glass at her. The affidavit described another incident during which appellant hit his wife three times with a belt and then forced her to have sexual intercourse with him. The affidavit also mentioned an incident that occurred while Mrs. Crawford and her parents attempted to take her things out of the marital home, when appellant threw a table.

This affidavit was admitted without limitation. Therefore, the document was improperly admitted for the truth of the matters asserted within the affidavit, but it nevertheless was properly admitted for other purposes, such as evidence of the victim's state of mind. See Hodges v. Commonwealth, 272 Va. 418, 436-37, 634 S.E.2d 680, 689-90 (2006) (discussing the state-of-mind exception to the general rule excluding hearsay evidence). During discussion of the motion *in limine*, appellant acknowledged that the Commonwealth offered the document as proof of Mrs. Crawford's state of mind as well as for the truth of the matters asserted therein.[27]

---

[27] Appellant did argue that some statements in the affidavit were too "remote" for the state-of-mind exception to apply or were irrelevant to Mrs. Crawford's state of mind. In response, the trial court redacted some content from the 2004 affidavit and completely excluded an earlier affidavit.

I would find that the affidavit was properly admissible under the state-of-mind exception to the hearsay rule. See Elliot v. Commonwealth, 30 Va. App. 430, 437-38, 517 S.E.2d 271, 275 (1999) (discussing the state-of-mind exception to the hearsay rule). As the Court explained in Hanson v. Commonwealth, 14 Va. App. 173, 188-89, 416 S.E.2d 14, 23 (1992):

> For the state of mind of the victim to be relevant to prove the state of mind of the accused, some nexus must exist which inferentially implicates the accused, such as by showing "previous threats made by the defendant towards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant."

(quoting United States v. Brown, 490 F.2d 758, 765-66 (D.C. Cir. 1973)). The affidavit clearly showed previous threats that appellant had made, past incidents of violence by him, and generally expressed Mrs. Crawford's fear of him. If the affidavit had been admitted solely for use as evidence of the victim's state of mind, rather than also for the truth of the statements that it contained, then the trial court would not have committed error. Therefore, while this harmless error analysis must consider any impermissible influence of the affidavit on the jury, we must be careful to also allow for the jury's proper use of the document as evidence of the victim's state of mind.

A. Rape Conviction

Although the jury could use the affidavit as evidence of Mrs. Crawford's state of mind, I cannot find beyond a reasonable doubt that admission of the affidavit was harmless in relation to the rape conviction.

The affidavit did specifically allege that appellant had raped his wife only a few months prior to her murder, describing in detail an incident on August 14, 2004. As rape was the only crime with which appellant was charged that was specifically described and alleged by Mrs. Crawford in the affidavit, this document would have had more impact on the jury's decision

to convict appellant of rape than on the decision to convict him of the other charges.[28] See Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999) ("In making that determination [of harmless error beyond a reasonable doubt], the reviewing court must consider a host of factors, including the importance of the tainted evidence in the prosecution's case . . . ."); Young v. Commonwealth, 47 Va. App. 616, 634, 625 S.E.2d 691, 700 (2006) (noting that the evidence of other crimes that was improperly admitted included several robberies, the crime for which Young was on trial), rev'd on other grds., 273 Va. 528, 643 S.E.2d 491 (2007); Boney v. Commonwealth, 29 Va. App. 795, 801-02, 514 S.E.2d 810, 813 (1999) (discussing the factual similarity between the erroneously admitted evidence of Boney's prior bad acts and the appealed convictions).

In addition, the Commonwealth's evidence, which proved Mrs. Crawford and appellant had recently had sexual intercourse, did not prove when or where this act of sexual intercourse occurred, nor did it prove whether the act was under duress or was consensual. Mrs. Crawford had not sustained any injuries to her genitalia. The police did not find any sperm or bodily fluids on the bed where they found Mrs. Crawford's body nor did they find any indication that the sexual intercourse had occurred in the car. None of the Commonwealth's evidence proved the age of the sperm found in Mrs. Crawford's vagina or elsewhere in her body. Appellant never confessed to having sexual intercourse with his wife, although he did admit that he shot her and took her to the motel room. The Commonwealth's evidence did prove that Mrs. Crawford had talked to appellant the night before her murder and that she appeared happy when her parents saw her just after that conversation. She also called appellant twice the next morning. Appellant claimed the parties were attempting to reconcile.

---

[28] Although the affidavit mentions that appellant placed a sofa against the Crawfords' apartment door during one incident, it is doubtful that the jury would have perceived this act as an "abduction," especially given the act of abduction that the jury was asked to consider.

While the evidence taken as a whole without the affidavit certainly creates a strong suspicion that appellant did in fact rape his wife, I cannot find that the introduction of the affidavit for the truth of the matter therein was harmless beyond a reasonable doubt on the rape conviction. Given the many questions regarding the sexual intercourse between appellant and Mrs. Crawford that remained unanswered by the Commonwealth's evidence, I believe that the affidavit's allegation that appellant previously raped his wife must have had a significant impact on the jury's decision to convict appellant of rape.

## B. The Remaining Convictions

I would find that the admission of the affidavit in relation to appellant's other convictions, excluding the rape conviction, was harmless beyond a reasonable doubt. The affidavit did not specifically allege that appellant had abducted, attempted to kill, or stolen from his wife previously, nor that he had previously threatened her with a gun. The affidavit was not the only evidence of appellant's previous violence. In addition, appellant admitted that he shot his wife and that he took her to the motel room after shooting her.

Generally, the record contained many sources of information regarding appellant's violence toward his wife. The affidavit, therefore, was merely cumulative of the other proof that rebutted appellant's contention that he would not hurt his wife and actually intended to hurt himself. For example, the preliminary protective order itself, admitted without objection, stated that a court had previously found "evidence sufficient to establish probable cause that family abuse, including forceful detention, resulting in physical injury to [Mrs. Crawford] or placing [her] in reasonable apprehension of serious bodily injury," had "recently occurred." Mrs. Crawford's father testified that appellant threw a table into the room and broke it when he accompanied his daughter to the marital home to remove her belongings. Her father also testified that appellant threatened his daughter. A police officer, who had responded to the couple's home when Mrs. Crawford was moving out, testified that appellant's manner was

- 55 -

intimidating and overbearing and that Mrs. Crawford asked appellant if he was threatening her. Mrs. Crawford's boss and a co-worker both testified about their knowledge of her fear of appellant. Her boss testified that he was not surprised to learn about the protective order against appellant, given the "history between them."[29] Thus, the affidavit's allegations of general violence and threats were merely cumulative of the other evidence presented by the Commonwealth.

In addition, appellant admitted that he shot his wife, although he claimed he shot her accidentally. However, appellant then covered up this "accident." He threw both her cell phone and a box that had her blood on it out of the car. Rather than taking his wife to a hospital, he left her alone in a motel room in Charlottesville, Virginia, many miles from her home and family. If she was alive when appellant left her in that room, Mrs. Crawford would not have been able to move or call anyone for help, according to the expert testimony. After leaving her alone and immobile in the motel room, appellant did not call someone and get help for Mrs. Crawford. Instead, he drove to Florida in her car to visit relatives whom he had not seen in many years and who did not know he was coming. He did not mention the "accident" to them, and he appeared happy and untroubled to them. In addition, he had purchased a gun just days before the murder of Mrs. Crawford.

In the context of this evidence, the incidents mentioned in the affidavit were cumulative evidence of appellant's violent history. Some witnesses actually testified about incidents described in the document, such as appellant throwing a table. Given this record, I find any error in admitting the affidavit was harmless in relation to the murder.

---

[29] Appellant did not object to this conclusion by the witness.

This same evidence supports a finding that the admission of the affidavit was harmless in relation to the abduction with intent to defile[30] conviction, a predicate offense for the capital murder conviction.[31] Appellant admitted to the police in Florida that he took Mrs. Crawford to

---

[30] Under Fitzgerald v. Commonwealth, 223 Va. 615, 632, 292 S.E.2d 798, 808 (1982), "defile" and "sexually molest" are "interchangeable within the meaning of" abduction with intent to defile.

[31] The capital murder indictment charged that appellant committed the premeditated murder of Mrs. Crawford while abducting her with the intent to defile her *or* while raping her. At trial, the jury was presented with Verdict Form No. A, which stated the choices before the jury on this indictment as follows:

> We, the jury, find the defendant, ANTHONY DALE CRAWFORD, guilty of the willful, deliberate and premeditated killing of Sarah Crawford in the commission of abduction with intent to defile Sarah Crawford and in the commission of the rape of Sarah Crawford.
>
> OR,
>
> We, the jury, find the defendant, ANTHONY DALE CRAWFORD, guilty of the willful, deliberate and premeditated killing of Sarah Crawford in the commission of abduction with intent to defile Sarah Crawford.
>
> OR,
>
> We, the jury, find the defendant, ANTHONY DALE CRAWFORD, guilty of the willful, deliberate and premeditated killing of Sarah Crawford in the commission of rape of Sarah Crawford.
>
> OR,
>
> We, the jury find the defendant, ANTHONY DALE CRAWFORD, guilty of first degree murder of Sarah Crawford.
>
> OR,
>
> We, the jury, find the defendant, ANTHONY DALE CRAWFORD, guilty of the second degree murder of Sarah Crawford.
>
> OR,

the motel and left her there alone after the shooting.  At that point, according to the assistant medical examiner, Mrs. Crawford could not move her body due to the severing of her spine.  Given appellant admitted that he shot her — and given her urgent need for medical attention – the evidence, independent of the affidavit, proved overwhelmingly that Mrs. Crawford certainly did not go willingly to the motel with appellant after he shot her.  As strong evidence supported the inference that Mrs. Crawford did not want appellant to take her to Charlottesville,[32] the jury could properly find on this evidence alone that appellant abducted his wife when he put her in the back seat of the car after shooting her and took her to a motel room rather than to a hospital.

The evidence of appellant's intent to defile Mrs. Crawford was also sufficiently strong, even without the affidavit.  After he took her to the motel, the evidence proved that appellant completely undressed Mrs. Crawford and placed her on the bed, as she was unable to move according to the medical expert.  He then positioned her now totally nude body in a sexually suggestive manner and left her in the motel room in that position.  This evidence clearly and

---

> We, the jury, find the defendant, ANTHONY DALE CRAWFORD, guilty of the second degree felony homicide of Sarah Crawford.
>
> OR,
>
> We, the jury, find the defendant, ANTHONY DALE CRAWFORD, not guilty.

Each of these findings was followed by a line for the signature of the jury foreman.  The jury foreman signed under the first finding, indicating that the jury found appellant guilty of committing the premeditated murder of Mrs. Crawford while committing both abduction with the intent to defile *and* rape.  Thus, the jury clearly made the factual finding that appellant committed capital murder based on the predicate offense of abduction with intent to defile as well as on the predicate offense of rape.  Therefore, on appeal, if the trial court's error was harmless in relation to either predicate offense, this Court may affirm appellant's capital murder conviction.

[32] The medical examiner testified that Mrs. Crawford could have lived for an hour after she was shot.  Appellant has never argued that Mrs. Crawford was already dead when he drove to the motel.

sufficiently indicated an intention to defile at the time of the abduction, independent of any allegations in the affidavit.[33]

In addition, regarding the use of a firearm during the commission of murder conviction, the use of a firearm during the commission of an abduction conviction, and the grand larceny conviction, the affidavit contained no information directly relevant to these charges. The document did not mention guns or the vehicle. The evidence proved that appellant purchased a gun just prior to the killing, and he admitted that he had a gun on the day of the shooting. He was found in possession of the stolen vehicle and admitted in his statement to the police that he drove it to Florida. Clearly the affidavit did not improperly influence the jury on these charges.

Overall, the evidence, considered as a whole, did not overwhelmingly support the rape conviction – independent of the affidavit's accusations of appellant's previous rape of Mrs. Crawford. Given this record, and the clear accusation in the affidavit that appellant previously raped his wife, I cannot find that the admission of the affidavit for the truth of the matter therein was harmless in relation to the rape conviction beyond a reasonable doubt. However, I would find that the affidavit was harmless in relation to all of appellant's other convictions, as the affidavit was repetitive of other evidence in the record and since evidence independent of the affidavit supported the appropriateness of these convictions beyond a reasonable doubt.

---

[33] This evidence of how appellant disrobed, placed, and positioned Mrs. Crawford in the motel room is directly relevant to the abduction with intent to defile charge, as appellant was still in the process of abducting her as he disrobed her and placed her in a provocative, sexually suggestive position – the position in which he left her. However, this evidence was not directly relevant to the rape conviction because the record does not indicate when or where the sexual intercourse between appellant and Mrs. Crawford occurred. The Commonwealth never proved whether the sexual intercourse occurred in the motel room or somewhere else, and the Commonwealth did not prove whether the sexual intercourse occurred before the shooting, prior to the abduction, or after appellant's rental of the motel room.

### III.  Sufficiency

I concur with the majority opinion that the evidence was sufficient to convict appellant of the crimes with which he was charged.  As discussed in the harmless error analysis *supra*, even excluding the affidavit, I would find the evidence was sufficient to convict appellant of these crimes, except for the rape conviction.[34]  When the affidavit is considered together with the rest of the evidence presented at trial, as it must be in a sufficiency analysis, see Sprouse v. Commonwealth, 53 Va. App 488, 493, 673 S.E.2d 481, 483 (2009), I would also find that a rational factfinder could conclude that the evidence was sufficient to convict appellant of rape.[35]  Thus, I would reverse only the rape conviction and, rather than dismissing it, I would remand for a new trial, solely on the rape indictment, if the Commonwealth be so inclined.  See Rankins v. Commonwealth, 31 Va. App. 352, 373, 523 S.E.2d 524, 534 (2000) (finding a Confrontation Clause error was not harmless and remanding for a new trial).  However, I concur with the majority opinion's conclusion that the remainder of the convictions should be affirmed, as the trial court's error was harmless beyond a reasonable doubt and the evidence before the jury was sufficient to convict appellant of those crimes.

---

[34] On appeal, appellant challenged the sufficiency of the evidence supporting only the abduction with intent to defile conviction and the rape conviction.  Therefore, the question of whether the evidence was sufficient to support his other convictions was not presented to this Court.

[35] In oral argument before this Court on rehearing en banc, appellant's counsel conceded – unlike at oral argument before the panel – that, when the affidavit is considered for the truth of the matter therein along with the other evidence admitted at trial, the evidence is sufficient for a jury to convict appellant of both rape and abduction with intent to defile.  However, appellant continued to argue that the admission of the affidavit was error, was not harmless error, and, therefore, the convictions must still be reversed.

## CONCLUSION

In conclusion, I respectfully dissent from the majority's decision to affirm appellant's rape conviction, for the reasons stated *supra*. I concur in the majority's overall conclusion that the remaining convictions should be affirmed, but for the reasons stated *supra*.

# VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **27th** *day of* **January, 2009**.

Anthony Dale Crawford, Appellant,

against        Record No. 1194-07-2
           Circuit Court Nos. CR05-71-2 through CR05-71-4 and CR05-71-6
               through CR05-71-8

Commonwealth of Virginia, Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On January 6, 2009 came the appellee, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on December 23, 2008, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof, the petition for rehearing *en banc* is granted with regard to the issue(s) raised therein, the mandate entered herein on December 23, 2008 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

Notwithstanding the provisions of Rule 5A:35, the following briefing schedule hereby is established: Appellant shall file an opening brief upon rehearing *en banc* within 21 days of the date of entry of this order; appellee shall file an appellee's brief upon rehearing *en banc* within 14 days of the date on which the opening brief is filed; and appellant may file a reply brief upon rehearing *en banc* within 14 days of the date on which the appellee's brief is filed. The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter.  It is further ordered that the appellee shall file twelve additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

Present:    Chief Judge Felton, Judges Elder and Beales
Argued at Richmond, Virginia


ANTHONY DALE CRAWFORD
                                                        OPINION BY
v.        Record No. 1194-07-2                 JUDGE LARRY G. ELDER
                                                     DECEMBER 23, 2008
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
Edward L. Hogshire, Judge

> Samantha E. Freed (Steven D. Rosenfield; Snook & Haughey, P.C.,
> on briefs), for appellant.
>
> Leah A. Darron, Senior Assistant Attorney General (Robert F.
> McDonnell, Attorney General, on brief), for appellee.


A jury found Anthony Dale Crawford (appellant) guilty of abduction with the intent to

defile, rape, and capital murder of Sarah Crawford, his estranged wife, and also convicted him of

use of a firearm in the commission of a murder, use of a firearm in the commission of an abduction,

and grand larceny.  On appeal, appellant argues that the trial court erred when it (1) permitted the

Commonwealth to introduce into evidence an affidavit that was prepared as part of Sarah

Crawford's request for a protective order against appellant, (2) permitted the Commonwealth to

introduce into evidence Mrs. Crawford's non-testimonial statements to her co-workers, and

(3) found the evidence was sufficient to support the jury's convictions for abduction with intent to

defile and rape.  We hold the trial court did not err in admitting the testimony concerning

Mrs. Crawford's statements to her co-workers.  We hold, in contrast, that the court's admission of

the challenged affidavit to prove the truth of the matter asserted violated the Confrontation Clause

and that its admission was harmless only as to appellant's conviction for grand larceny. As a result, we reverse all of his convictions except the conviction for grand larceny, which we affirm.

Because appellant also challenges the sufficiency of the evidence to prove rape and abduction with intent to defile, we evaluate the sufficiency of the evidence, including the improperly admitted affidavit, to assure that remand for retrial will not violate double jeopardy principles. We hold the evidence was insufficient to support appellant's convictions for rape, abduction with intent to defile, and use of a firearm in the commission of abduction, and thus we dismiss these indictments. Because we reverse and dismiss the convictions for rape and abduction with intent to defile, which provided the basis for convicting appellant of capital murder rather than first-degree murder, we also reverse the capital murder conviction. Because appellant does not challenge the sufficiency of the evidence to prove murder, we remand for retrial on an offense no greater than first-degree murder without considering the sufficiency of the evidence to prove this offense. For the same reason, we remand for retrial appellant's conviction for use of a firearm in the commission of murder.

## I. BACKGROUND

Appellant and his wife, Sarah Crawford, separated in October of 2004. Several people were aware, based on statements made by Mrs. Crawford, that she was afraid of her husband. Mrs. Crawford told both a co-worker and her boss that she was afraid appellant might harm her. Prior to their separation, Mrs. Crawford even chose the location of her desk at work because it overlooked the parking lot and she wanted to be able to see appellant if he drove up to the building.

On October 29, 2004, after their separation, Mrs. Crawford went to the apartment in Manassas that she previously shared with appellant in order to pick up some items for her new home. Her parents accompanied her. Appellant was hostile and overbearing toward Mrs. Crawford, and he initially refused to let her take anything. Instead, he called the police. After

- 2 -

the police arrived, appellant continued his hostile behavior, even though the police instructed him that he should allow Mrs. Crawford to take her things and asked him to calm down. At one point, appellant whispered something to Mrs. Crawford, and she asked appellant if he was threatening her. After the police left, when Mrs. Crawford said she wanted to take a particular table, appellant picked up the table and threw it across the room, breaking it.

Shortly after this incident, Mrs. Crawford went to the Prince William County Juvenile and Domestic Relations District Court (JDR court) and requested a preliminary protective order to prevent appellant from having contact with her. She signed an affidavit in which she described several incidents between her and appellant. The JDR court granted her request for a preliminary protective order. On November 16, 2004, at the request of Mrs. Crawford, that protective order was dismissed.

During and after the time that the protective order was in effect, Mrs. Crawford continued to have contact with her husband. Prior to the dismissal of the protective order, Mrs. Crawford paid appellant's tuition for a trade school he wanted to attend. Between November 1 and November 18, 2004, the parties communicated by telephone on numerous occasions, with several of the phone calls lasting ten to twenty minutes. A call that Mrs. Crawford made to appellant in the late afternoon of November 18 lasted twelve minutes, and when Mrs. Crawford met her parents for dinner a short time later, she appeared "really very happy." Mrs. Crawford also called appellant twice on the morning of November 19.

On November 18, 2004, Mrs. Crawford informed her employer that she would be late to work the next morning but would arrive no later than 1:00 p.m. However, she never appeared for work on November 19, which her manager described as surprising. Also, before leaving work on November 18, 2004, she had a co-worker print a document for her because her printer was not working. That document was a statement for appellant's signature purporting to release

- 3 -

Mrs. Crawford's father from any liability on the apartment lease Mrs. Crawford's father had co-signed for the two while they were still residing together.

Between 9:30 and 10:30 a.m. on November 19, a hunter discovered a box beside the road. Inside the box was an invoice listing Mrs. Crawford's employer and her workplace address. Mrs. Crawford's employer indicated he had given the box to her to mail earlier in the week. The location where the box was found was approximately twenty miles from Mrs. Crawford's workplace. The box had a small amount of Mrs. Crawford's blood on it. Late in the afternoon on the same day, a Manassas resident found Mrs. Crawford's cell phone in his driveway. The following day, Mrs. Crawford was not at her home when her date arrived to pick her up, as they had previously arranged. When she did not answer the door, after several attempts, he left without seeing her. Mrs. Crawford's parents, who began worrying about their daughter, did not find anything out of place or unusual when they went into her home, except the cat's food and water bowls were empty. Mrs. Crawford's mother had last spoken to her daughter on the phone at about 10:00 p.m. on November 18, and when she entered Mrs. Crawford's apartment on November 21, she "knew" from the shape of the bed linens that Mrs. Crawford had slept in her bed the evening of November 18. On the nightstand beside the bed was a book titled in part, "Starting Over After an Abusive Relationship."

On November 22, 2004, the night manager of a Quality Inn in Charlottesville discovered Mrs. Crawford's body in one of the motel rooms. The room had been paid for by appellant for the night of November 19 to November 20, but no one had officially checked out of the room. Mrs. Crawford was lying on her back on the bed, naked and covered by bed linens. Her hands were folded over her abdomen, and her legs were in a "frog-like position." Although she had some bruising, the assistant medical examiner testified at trial that the marks did not look like "grab marks." There was no injury to her genitalia, although appellant's sperm was found in her

- 4 -

vagina, and sperm from an undetermined source was found in or around her mouth and anus. No sperm was found on the bed or anywhere else in the room. The forensic scientist who examined the sperm taken from Mrs. Crawford's body could not determine its age.

A bloody motel towel was taped under Mrs. Crawford's right armpit, covering a fatal gunshot wound. The police did not find a gun or any clothing with a corresponding hole in the motel room. There was no gunshot residue on the body. The motel room did not contain any signs indicating that a struggle took place there, and nothing suggested that the shooting occurred in the room. Women's clothes and a purse containing Mrs. Crawford's identification were on the dresser, and a suitcase containing men's clothing and a pill bottle bearing appellant's name were also in the room. The television was on, a "Do Not Disturb" sign was on the door, and the air conditioning had been set so that the room was cold. Police found appellant's fingerprint in the bathroom.

According to the assistant medical examiner, Mrs. Crawford was shot through the right side of her chest, so that the bullet passed through her right lung and then through her vertebra, severing her spinal cord and lodging in her back. Upon the severing of her spinal cord, Mrs. Crawford would have lost her ability to walk. The assistant medical examiner testified he could not say how long Mrs. Crawford would have lived after sustaining such an injury and that he "might expect [based on] anecdot[al evidence] that it might be minutes" but that it was possible she lived a "shorter" amount of time and also possible that she "survived an hour."

The motel's clerk testified at trial that appellant had driven into the parking lot of the Charlottesville Quality Inn at approximately 11:00 a.m. on November 19, 2004, and parked in the spot farthest from the front desk. He told the clerk that he had been driving all night and asked for a quiet room. He gave his name as Dale Crawford and paid with a $100 bill. He was driving Mrs. Crawford's car, which other evidence established actually belonged to her father.

On November 29, 2004, the police found appellant in Florida, still driving Mrs. Crawford's car. The drivers' side window of the car was broken out, and the driver's seat and rear seat had Mrs. Crawford's blood on them.[1] No blood was found on the front passenger's seat, and no evidence was presented at trial that any other bodily fluids were found in the car. A box of ammunition was in the trunk.

Appellant's cousin said that appellant arrived in Florida on November 22, 2004, said he was taking a vacation, and seemed happy. The cousin had not seen appellant in seventeen years and had received no advance notice that appellant was coming to visit. The driver's side window of Mrs. Crawford's car was broken when appellant arrived in Florida. Police were able to locate appellant in Florida after he contacted his daughter and asked her to wire him some money.

After appellant's apprehension in Florida, he gave a videotaped statement to police. He claimed Mrs. Crawford came to his home on the morning of November 19, 2004, and that they drove to Charlottesville for the weekend in an attempt to reconcile, a trip he said took one to one-and-one-half hours. Appellant said that Mrs. Crawford drove them to a McDonald's in Charlottesville for breakfast. He claimed that, as they sat in the car in the parking lot, he threatened to shoot himself and held a loaded, cocked gun over his chest. He said that Mrs. Crawford reached over and grabbed the gun, that they wrestled over it, and that it discharged accidentally, hitting Mrs. Crawford. Appellant said he then moved his wife to the back seat of the car, where forensics technicians later found her blood, and drove to the motel where her body was later found. When asked whether she said anything after he shot her, he said she told him that she loved him. Other than appellant's claim that Mrs. Crawford made this one statement after she was shot, the record does not indicate that appellant made any statements

---

[1] The blood patterns in the car and the trajectory of the bullet through Mrs. Crawford's body suggest that she was sitting in the driver's seat and was shot by someone sitting in the front passenger's seat.

about how long Mrs. Crawford lived after she was shot or whether she was alive when he moved her to the back seat of the car, drove her to the motel, or carried her into the motel room.[2]

Before trial, appellant objected to the introduction of the affidavit that Mrs. Crawford completed when she requested a preliminary protective order from the JDR court. Appellant argued that the document was testimonial hearsay and, therefore, inadmissible under Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The affidavit described several incidents when appellant had threatened or physically attacked Mrs. Crawford, including a detailed description of an alleged rape. The Commonwealth, which sought to admit the affidavit to prove the truth of the matters asserted therein, agreed that the affidavit was testimonial hearsay if admitted for that purpose, but it argued the trial court should apply the forfeiture-by-wrongdoing exception to the hearsay rule to avoid what would otherwise be a violation of appellant's confrontation rights. The Commonwealth argued this exception did not require that the trial court find appellant had killed his wife to prevent her from testifying, but instead required only a preliminary finding that appellant did kill her. The trial court ruled the affidavit was testimonial but was admissible under the forfeiture-by-wrongdoing exception to the hearsay rule, as explained by the Commonwealth, and, thus, that its admission did not violate appellant's confrontation rights.

Appellant also objected to the introduction into evidence of the statements that Mrs. Crawford made to her boss and a co-worker. Appellant argued that the statements were hearsay

---

[2] The quality of some portions of the digital recording of appellant's interview by Florida police were clear, and others were quite poor. At one point, investigators asked appellant how he knew Mrs. Crawford was dead. Although the trial court was not required to find appellant's statement on this or any other subject was credible, other than the medical examiner's testimony, appellant's statement was the only potential source of evidence concerning how long she lived after she was shot. Appellant's response during the recorded interview was either not discernible or was, "'Cause I knew it," neither of which provides any evidence concerning how long she lived after being shot.

and, therefore, that they were not admissible under the state-of-mind exception to the hearsay rule. The trial court overruled appellant's motion to exclude this evidence and admitted the evidence under the state-of-mind exception.

## II. ANALYSIS

### A. THE AFFIDAVIT

#### 1. Appellant's Confrontation Rights

In ruling on appellant's motion to exclude the affidavit, the trial court held "it is clear, and the Commonwealth does not dispute, that these statements do fall within the scope of Crawford" because they are testimonial hearsay. On appeal, the Commonwealth contends the statements in the affidavit were not testimonial and avers that this legal issue is subject to *de novo* review on appeal in spite of the prosecutor's concession below. See generally Michels v. Commonwealth, 47 Va. App. 461, 465, 624 S.E.2d 675, 678 (2006) (holding that whether statements are testimonial is a legal issue subject to *de novo* review).

We disagree. Whether or not the prosecutor took a position on this issue below, the trial court expressly ruled on the issue, holding the affidavit was testimonial but that its admission did not violate the Confrontation Clause because the forfeiture-by-wrongdoing doctrine applied. The Commonwealth had no right to appeal that ruling, and it would have had no right to appeal even if the trial court had excluded the affidavit on the grounds appellant alleged. See Code § 19.2-398. Thus, the Commonwealth also lacked the right to ask this Court to revisit that issue in appellant's appeal because to do so would "serve as a subterfuge for a constitutionally prohibited cross-appeal." See White v. Commonwealth, 37 Va. App. 658, 665, 561 S.E.2d 12, 16 (2002) (noting that although we may, under appropriate circumstances, "affirm the decision of the trial court when it has reached the right result for the wrong reason[,] . . . 'the Commonwealth cannot use [this principle] as a subterfuge for a constitutionally prohibited

cross-appeal'" (quoting Driscoll v. Commonwealth, 14 Va. App. 449, 452, 417 S.E.2d 312, 313 (1992))); see also Hart v. Commonwealth, 221 Va. 283, 289-90, 269 S.E.2d 806, 810-11 (1980).

We next consider whether the affidavit, although determined by the trial court to be testimonial when offered for the truth of its contents, was nevertheless admissible under forfeiture-by-wrongdoing principles. While this appeal was pending, the United States Supreme Court decided Giles v. California, ___U.S. ___, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008), reviewing the forfeiture-by-wrongdoing exception to the general prohibition on hearsay evidence, the Constitution's Sixth Amendment right to confront witnesses, and the application of Crawford, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177. During Giles's murder trial, the court allowed the jury to hear testimony about statements the decedent made to police officers when they responded to a domestic violence incident between Giles and the decedent a few weeks before the murder. Id. at ___, 128 S. Ct. at 2681-82, 171 L. Ed. 2d at 494. The trial court admitted this evidence based on a California law that permitted "admission of out-of-court statements describing the infliction or threat of physical injury on a declarant when the declarant is unavailable to testify at trial and the prior statements are deemed trustworthy." Id. at ___, 128 S. Ct. at 2682, 171 L. Ed. 2d at 494. The California Supreme Court found the law did not violate the Sixth Amendment's Confrontation Clause. Id.

On appeal to the United States Supreme Court, California conceded that the decedent's statements to the officers were testimonial, and the Supreme Court accepted "without deciding" that representation. Id. at ___, 128 S. Ct. at 2682, 171 L. Ed. 2d at 494-95. The Supreme Court then considered "whether the theory of forfeiture by wrongdoing accepted by the California Supreme Court is a founding-era exception to the confrontation right" and, thus, allowed admission of the statements during Giles's murder trial without violating the Sixth Amendment. Id. at ___, 128 S. Ct. at 2682, 171 L. Ed. 2d at 495. In this discussion, the Supreme Court noted:

Not only was the State's proposed exception to the right of confrontation plainly not an "exceptio[n] established at the time of the founding," [Crawford, 541 U.S.] at 54, 124 S. Ct. 1354, 158 L. Ed. 2d 177; it is not established in American jurisprudence since the founding. American courts never – prior to 1985 – invoked forfeiture outside the context of deliberate witness tampering.

\* \* \* \* \* \* \*

If the State's rule had an historical pedigree in the common law or even in the 1879 decision in Reynolds [v. United States, 98 U.S. 145 (1879)], one would have expected it to be routinely invoked in murder prosecutions like the one here, in which the victim's prior statements inculpated the defendant. It was never invoked in this way. The earliest case identified by the litigants and amici curiae which admitted unconfronted statements on a forfeiture theory without evidence that the defendant had acted with the purpose of preventing the witness from testifying was decided in 1985. United States v. Rouco, 765 F.2d 983 ([11th Cir. 1985]).

Id. at ___, 128 S. Ct. at 2687, 171 L. Ed. 2d at 499-500. After reviewing the history of the common law and the forfeiture-by-wrongdoing exception, the United States Supreme Court held that the exception applies only where a defendant "engaged in conduct *designed* to prevent a witness from testifying," i.e., he "intended to prevent a witness from testifying." Id. at ___, 128 S. Ct. at 2683-84, 171 L. Ed. 2d at 496-97. The Supreme Court found the California trial court committed constitutional error, infringing Giles's right of confrontation, by admitting the decedent's statements where no evidence suggested that Giles had killed the decedent to prevent her from testifying. Id. at ___, 128 S. Ct. at 2686-88, 171 L. Ed. 2d at 498-501.[3]

---

[3] The concurring opinions in Giles do not disagree with the analysis of the majority regarding the forfeiture-by-wrongdoing doctrine as applied to testimonial documents. Justices Thomas and Alito wrote concurring opinions to note their disagreement with California's concession that the victim's statements were testimony. ___ U.S. at ___, 128 S. Ct. at 2693-94, 171 L. Ed. 2d at 506-07 (Thomas, J., concurring); Id. at ___, 128 S. Ct. at 2694, 171 L. Ed. 2d at 507 (Alito, J., concurring). Justice Souter, with whom Justice Ginsburg joined, concurred in the majority's description of the exception, but noted that equity, rather than the historical record, defines the forfeiture-by-wrongdoing doctrine. Id. at ___, 128 S. Ct. at 2694-95, 171 L. Ed. 2d at 507-08 (Souter, J., concurring).

- 10 -

Here, the Commonwealth concedes that appellant did not kill Sarah Crawford in order to prevent her from testifying, as California conceded in Giles. We accept the Commonwealth's concession and, thus, given the Supreme Court's holding in Giles, conclude the trial court committed constitutional error by admitting Mrs. Crawford's affidavit to prove the truth of its contents under an improper formulation of the concept of forfeiture by wrongdoing.

## 2. Harmless Error Analysis

We next determine if the introduction of this evidence in violation of appellant's Sixth Amendment rights affected the jury's decision, i.e., if this error was harmless. See Reid v. Commonwealth, 213 Va. 790, 796, 195 S.E.2d 866, 871 (1973). We are mindful that:

> [t]he Supreme Court, in Chapman v. California, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." As the Supreme Court stated in Delaware v. Van Arsdall, 475 U.S. 673, 681, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986), "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." See Neder v. United States, 527 U.S. 1, 119 S. Ct. 1827, 1837, 144 L. Ed. 2d 35 (1999).
>
> A court, when determining whether federal constitutional error is harmless, must consider several factors, including the importance of the tainted evidence in the prosecution's case, whether the evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and, of course, the overall strength of the prosecution's case.

Dearing v. Commonwealth, 259 Va. 117, 123, 524 S.E.2d 121, 124-25 (2000). Errors are presumed harmful, and the Commonwealth bears the burden of proving that a constitutional error was harmless beyond a reasonable doubt. See Chapman, 386 U.S. at 24, 87 S. Ct. at 828, 17 L. Ed. 2d at 710-11; Joyner v. Commonwealth, 192 Va. 471, 477, 65 S.E.2d 555, 558-59 (1951); Beverly v. Commonwealth, 12 Va. App. 160, 163, 403 S.E.2d 175, 177 (1991).

The affidavit in this case was prepared by an intake officer, pursuant to Code § 16.1-253.1, for use before the JDR court in support of Mrs. Crawford's request for an *ex parte* preliminary protective order that would prohibit contact between her and appellant. Mrs. Crawford signed the typed document on November 1, 2004, swearing that it was "true and accurate to the best of [her] knowledge and belief." The affidavit described several incidents between the spouses that had occurred in the four months leading up to the murder.[4] The affidavit included an incident in which appellant threw Mrs. Crawford against a door and, when she tried to leave, he threw a glass at her and another incident in which he pushed her onto a couch and threatened her with his fist. The affidavit also described an incident during which appellant hit his wife three times with a belt, physically forced her to have sexual intercourse with him, "ripped the phone out of the wall" when she tried to call the police, and "put the sofa up against the door so [she] could not get out." The affidavit also mentioned an incident that occurred three days prior to her signing the affidavit, in which appellant "began . . . throwing and breaking stuff" when Mrs. Crawford returned to the marital home with her parents to retrieve her belongings. The affidavit further included Mrs. Crawford's recollection that, two days prior to her signing the affidavit, appellant "called [her] and told [her] that [she] must want to die," that "he understands why husbands kill their wives," and that "he would find [her] and come to [her] work." The affidavit concluded, "I am afraid of Anthony. I fear he may physically hurt me or even kill me. I want him to stay away from me and my family."

### a. Rape Conviction

We hold that admission of the affidavit was not harmless beyond a reasonable doubt in relation to the rape conviction. Code § 18.2-61 defines rape, as relevant to these facts, as

---

[4] The original affidavit included incidents that occurred prior to August 2004, but those incidents were redacted at the direction of the trial court before the document was presented to the jury.

occurring when "any person has sexual intercourse with a complaining witness . . . and such act is accomplished . . . against the complaining witness's will, by force, threat or intimidation."[5] Therefore, the Commonwealth had to prove two elements to convict appellant of rape: (1) that appellant and Mrs. Crawford had sexual intercourse and (2) that the act was against Mrs. Crawford's will through the use of force, threat, or intimidation.

The forensic scientist testified that sperm was found in Mrs. Crawford's vagina and that DNA testing established the sperm was appellant's. Therefore, the physical evidence proved the parties had sexual intercourse, and the admission of the affidavit as to this element of rape was harmless beyond a reasonable doubt.

However, the affidavit probably affected the jury's decision regarding Mrs. Crawford's *willingness* to engage in sexual intercourse. The affidavit contains Mrs. Crawford's sworn statement that appellant raped her on a prior occasion approximately three months before her death. The record contains no evidence other than the affidavit indicating that appellant had ever forced Mrs. Crawford to have sexual intercourse with him. The assistant medical examiner testified that she did not observe any injuries on Mrs. Crawford's body suggesting force had been used to effect sexual intercourse. Although Mrs. Crawford had some bruising to her upper body, the evidence failed to prove the age of those bruises or suggest how Mrs. Crawford became bruised. The physical evidence that force, threats, or intimidation were used to overcome the victim's will was not overwhelming, especially as the spouses could have engaged in sexual intercourse before Mrs. Crawford knew appellant had a gun.

In addition, some evidence suggested the spouses were attempting to reconcile. Mrs. Crawford was helping her husband with his education. She had asked for the dismissal of

---

[5] Although Code § 18.2-61 provides that sexual intercourse "through the use of the complaining witness's . . . physical helplessness" also constitutes rape, the jury instructions in this case did not include this alternative element.

the protective order and had several telephone conversations with him that lasted ten to twenty minutes. After a twelve-minute conversation with appellant on the afternoon of November 18, Mrs. Crawford met her parents for dinner and appeared very happy. Telephone records also suggest Mrs. Crawford called appellant twice on the morning of November 19, calls that appellant claimed she made while on her way to his residence to begin their reconciliation trip.

If the evidence had proved appellant had sexual intercourse with Mrs. Crawford in the car or the motel room after she was incapacitated by the gunshot wound, then perhaps the influence of the affidavit on the jury's decision would not be so important. However, no evidence suggested where or when they had intercourse. No sperm was found in the car or in the motel room. The forensic scientist could not determine the age of the sperm that was retrieved from Mrs. Crawford's body. Appellant made no statement to the police regarding having had sexual intercourse with his wife near the time of her death. Therefore, the Commonwealth did not prove that appellant had sexual intercourse with Mrs. Crawford against her will, through the use of force, threat, or intimidation.

Given the lack of other evidence and the specific allegation of rape contained in the affidavit, we conclude the admission of that document was not harmless beyond a reasonable doubt as to the rape conviction. See Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999) ("In making that determination [of harmless error beyond a reasonable doubt], the reviewing court must consider a host of factors, including the importance of the tainted evidence in the prosecution's case . . . ."); Young v. Commonwealth, 47 Va. App. 616, 634, 625 S.E.2d 691, 700 (2006) (noting that the evidence of other crimes that was improperly admitted included several robberies, the crime for which Young was on trial), rev'd on other grounds, 273 Va. 528, 643 S.E.2d 491 (2007); Boney v. Commonwealth, 29 Va. App. 795, 801-02, 514 S.E.2d 810, 813

(1999) (discussing the factual similarity between the erroneously admitted evidence of Boney's prior bad acts and the appealed convictions).

Upon finding the constitutional error is not harmless, we next determine whether the evidence is sufficient to support the conviction, as appellant raises the sufficiency of the evidence to prove rape in his appeal. If the evidence is insufficient, remanding for a new trial would violate double jeopardy principles, and we must reverse and dismiss the conviction rather than reverse and remand the conviction for a new trial. Leybourne v. Commonwealth, 222 Va. 374, 377, 282 S.E.2d 12, 14 (1981) (reversing and dismissing a conviction because mother's testimony was inadmissible and the evidence was insufficient to prove Leybourne's guilt beyond a reasonable doubt); see Parsons v. Commonwealth, 32 Va. App. 576, 529 S.E.2d 810 (2000) (citing Burks v. United States, 437 U.S. 1, 18 (1978), and Lockhart v. United States, 488 U.S. 33, 40-42 (1988), for the proposition that, in conjunction with a ruling that reversal is required because of improperly admitted evidence, a full sufficiency analysis is required because, "[i]f the evidence adduced at trial was insufficient to convict [the defendant], a remand for retrial would violate the Constitution's prohibition against double jeopardy"). "In making this assessment, we consider all admitted evidence," without regard for whether it was properly admitted or is likely to be admitted in any subsequent retrial. Hargraves v. Commonwealth, 37 Va. App. 299, 312-13, 557 S.E.2d 737, 743 (2002).

The evidence here, viewed under these standards, did not prove beyond a reasonable doubt that appellant committed rape.

> It is well settled in Virginia that to justify conviction of a crime, it is not sufficient to create a suspicion or probability of guilt, but the evidence must establish the guilt of an accused beyond a reasonable doubt. It must exclude every reasonable hypothesis except that of guilt. The guilt of a party is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence.

Cameron v. Commonwealth, 211 Va. 108, 110-11, 175 S.E.2d 275, 276 (1970); see Reese v. Commonwealth, 230 Va. 172, 175, 335 S.E.2d 266, 268 (1985) ("The evidence gives rise to suspicion of guilt but it is not sufficient as a matter of law to establish guilt by the requisite standard of proof beyond a reasonable doubt."). Too many reasonable hypotheses of appellant's innocence on the charge of rape remain, even after reviewing all the evidence including the affidavit. See Hargraves, 37 Va. App. at 312-13, 557 S.E.2d at 743.

The evidence, viewed in the light most favorable to the Commonwealth, see Hughes v. Commonwealth, 18 Va. App. 510, 518, 446 S.E.2d 451, 456 (1994) (en banc) (noting the standard of review for sufficiency questions), did not prove where or when the sexual intercourse occurred. Although the affidavit supported a finding that appellant had raped his wife several months earlier while they were still living together, nothing in the record indicated appellant used force, threats, or intimidation at the time of the act of intercourse upon which his conviction for rape was based. In the week prior to the murder, Mrs. Crawford asked that the protective order be dismissed; she paid appellant's tuition; she called him several times; she printed a document for his signature; she took a half-day's leave from work; and she purchased gasoline near his home. The physical evidence did not exclude the possibility that the act was consensual as the medical examiner found no injuries to Mrs. Crawford's vagina. Because the examiner could not determine the age of the sperm samples collected from Mrs. Crawford's body, the Commonwealth could not exclude the reasonable hypothesis that the intercourse occurred well before the shooting and was consensual. Nothing found in the motel room, the car, or anywhere else suggested where or when appellant and his wife had sexual intercourse. Therefore, a reasonable hypothesis existed that the intercourse occurred prior to the shooting, when Mrs. Crawford may have been a willing participant. Therefore, we reverse and dismiss the rape conviction.

b. Abduction with Intent to Defile Conviction

To convict appellant of abduction with the intent to defile, the Commonwealth needed to prove both that he intentionally abducted Mrs. Crawford by "depriv[ing] his victim of her liberty," Brown v. Commonwealth, 230 Va. 310, 314, 337 S.E.2d 711, 714 (1985), and that he committed this act with the intention to sexually molest her,[6] see Scott v. Commonwealth, 228 Va. 519, 525 n.2, 323 S.E.2d 572, 576 n.2 (1984). See Code § 18.2-48. Here, the affidavit contained information relevant to determining both whether appellant deprived his wife of her liberty and whether he intended to sexually molest her. After examining the record, we conclude that admission of the affidavit was not harmless beyond a reasonable doubt regarding either the underlying abduction or the intent to defile.

As to proof of the underlying abduction, the evidence established Mrs. Crawford spoke with appellant on the telephone for about ten minutes on the afternoon of Thursday, November 18, before having dinner with her parents and going home to her residence. Additional evidence indicated that Mrs. Crawford may have planned to meet with appellant on the morning of Friday, November 19, to get him to sign a statement releasing her father from any liability on the lease Mrs. Crawford's father had co-signed for the two while they were still residing together. Before leaving her job on the afternoon of November 18, Mrs. Crawford had one of her co-workers print the statement for her because the printer attached to her computer was not working, and Mrs. Crawford said she was taking personal leave the next morning but would arrive at work no later than 1:00 p.m. to disburse company funds to another co-worker who was leaving town on business. Phone records indicated that Mrs. Crawford made two brief calls from her cell phone to appellant's home phone on the morning of November 19, one at 7:52 a.m. and a second one at

---

[6] Under Fitzgerald v. Commonwealth, 223 Va. 615, 632, 292 S.E.2d 798, 808 (1982), "defile" and "sexually molest" are "interchangeable within the meaning of" abduction with intent to defile.

- 17 -

8:52 a.m., and credit card information indicated she purchased gasoline in the vicinity of appellant's residence shortly before that second telephone call. Additional evidence supported a finding that Charlottesville was a sixty- to ninety-minute drive from appellant's residence in Manassas, permitting the inference that, if Mrs. Crawford was not shot until reaching Charlottesville as appellant claimed, she could willingly have chosen to drive to Charlottesville and back with appellant and still have returned to her job by 1:00 p.m. as she had promised. Although the evidence tended to indicate Mrs. Crawford had not planned to spend the weekend with appellant in Charlottesville, the evidence other than the affidavit did not compel a finding that her trip with him was against her will, and the affidavit could have impacted the jury's finding regarding whether she willingly drove him to Charlottesville.

Assuming the evidence concerning the box with traces of Mrs. Crawford's blood on it that was found by the side of the road near Manassas between 9:30 and 10:30 a.m. would have been sufficient to establish appellant shot Mrs. Crawford while they were still in the Manassas area and then drove her to Charlottesville, the Commonwealth's evidence also did not compel a finding that appellant abducted Mrs. Crawford before or after the shooting. The evidence indicated appellant was without a car of his own at that time, permitting the inference that Mrs. Crawford, who went willingly to appellant's home that morning, might also willingly have agreed to take him on an errand before she was shot. The evidence also did not compel a finding that appellant abducted Mrs. Crawford after she was shot because no evidence in the record established how long she lived after being shot. Instead, the assistant medical examiner testified he could not say how long Mrs. Crawford would have lived after sustaining such an injury and that he "*might* expect [based on] anecdot[al evidence] that it *might* be minutes" but that it was *possible* she lived a "shorter" amount of time and also *possible* that she "survived an hour." (Emphases added.) Thus, no evidence compelled a finding that appellant's pulling Mrs. Crawford's body into

- 18 -

the back seat, driving her to the motel, or moving her inside the motel constituted a deprivation of her liberty necessary to prove abduction.

The improperly admitted affidavit, moreover, contained Mrs. Crawford's sworn statements that appellant had used force and violence against her on previous occasions and that he had previously abducted her in conjunction with the same incident in which he had raped her while they still resided together, ripping the telephone out of the wall when she attempted to call the police and barricading a door in their home so that she could not get out. Thus, we conclude that the erroneous admission of the affidavit was not harmless beyond a reasonable doubt as to the underlying abduction.

The introduction of the affidavit also was not harmless as to the intent element of abduction with intent to defile because, as discussed above, see supra Section II(A)(2)(a), the affidavit provided the jury with the only evidence of sexual misconduct. Although the physical evidence proved appellant had sexual intercourse with Mrs. Crawford, the physical evidence did not prove that contact was unwanted. See Scott, 228 Va. at 525, 323 S.E.2d at 576 (noting that the intention to persuade someone to have sexual intercourse is not the equivalent of the intent to defile). We conclude that introduction of the affidavit was not harmless beyond a reasonable doubt in its effect on the jury's consideration of the underlying abduction or the intent to defile element.

We now conduct the necessary double jeopardy analysis by examining the sufficiency of all the evidence, including the erroneously admitted affidavit, to support the conviction for abduction with intent to defile. We hold that all the evidence, viewed in the light most favorable to the Commonwealth, was insufficient to prove appellant abducted Mrs. Crawford or acted with an intent to defile. The fact that appellant had raped and abducted Mrs. Crawford on a prior occasion in the apartment they shared did not prove that he abducted her or acted with an intent

to defile her on this occasion, and the remaining evidence failed to exclude the reasonable hypothesis that she willingly engaged in sexual intercourse with him and that he did not engage in any acts that deprived her of her personal liberty. Therefore, we reverse and dismiss the conviction for abduction with intent to defile. Because the evidence fails to prove abduction, we also reverse and dismiss the conviction for use of a firearm during the commission of an abduction.

### c. Capital Murder Conviction

The jury, in finding appellant guilty of capital murder, indicated that it believed appellant killed Mrs. Crawford while in the commission of abduction with intent to defile and in the commission of rape. Based on the foregoing analysis, however, we have reversed both these predicate offenses. See supra Sections II(A)(2)(a) & (2)(b). Therefore, admission of the affidavit clearly was not harmless as to the capital murder conviction. We thus reverse appellant's conviction for capital murder and the concomitant use of a firearm in the commission of murder, and we remand for retrial on the lesser-included offense of first-degree murder and the related firearm offense if the Commonwealth be so advised. See Britt v. Commonwealth, ___ Va. ___, ___, ___ S.E.2d ___, ___ (Oct. 31, 2008). Because appellant challenges the sufficiency of the evidence to prove only rape and abduction with intent to defile, the offenses used to elevate the charge of first-degree murder to capital murder, and does not challenge the sufficiency of the evidence to prove the underlying murder or concomitant use of a firearm, we need not consider the sufficiency of the evidence to prove first-degree murder and use of a firearm before remanding for a new trial on these offenses.

### d. Grand Larceny Conviction

Appellant's conviction for grand larceny required proof that he "wrongful[ly] or fraudulent[ly] [took] . . . another's property [valued at $200 or more] without [the owner's]

- 20 -

permission and with the intent to deprive the owner of that property permanently." Tarpley v. Commonwealth, 261 Va. 251, 256, 542 S.E.2d 761, 763-64 (2001). The erroneously admitted affidavit contained no information directly relevant to appellant's conviction for grand larceny, and independent evidence proved appellant stole the car. Appellant was found in possession of the vehicle and admitted in his statement to the police that he drove it to Florida. Mrs. Crawford's father, who actually owned the car, testified he had purchased the car for his daughter, not appellant. We find the error in admitting the affidavit was harmless beyond a reasonable doubt with regard to the grand larceny conviction, and therefore, we affirm this conviction.

### B. THE CO-WORKERS' TESTIMONY

Around the time that appellant and his wife separated, Mrs. Crawford asked a co-worker for tickets to a soccer game. The co-worker testified at trial that Mrs. Crawford said she intended to give the tickets to appellant "because [Mrs. Crawford] plan[ned] on moving out. She didn't want him there while she was moving out – afraid of an incident." Appellant objected to the introduction of this testimony, but the trial court ruled it was admissible.

Mrs. Crawford's boss testified that she showed him "a court protective order against appellant," which "wasn't a surprise" to him given their history. Her boss also explained that Mrs. Crawford chose to have her desk in the busy foyer of their office because she wanted to be able to see out a window and observe the parking lot, so that she would know "whether [appellant] was coming in the parking lot or not." Mrs. Crawford also expressed "concern[] for her well-being staying in the apartment" with her husband. When she finally moved out, she moved to a home with a long driveway, so that she could see anyone coming to her house, and she took different routes from her office to her new home, she explained to her boss. Appellant objected to this testimony, and the trial court overruled the objection.

- 21 -

Appellant argues that none of this testimony was admissible under the state-of-mind exception to the hearsay rule. We disagree. "The key to admissibility of evidence showing a victim's state of mind is . . . its relevance to a material issue in the case." Hodges v. Commonwealth, 272 Va. 418, 436, 634 S.E.2d 680, 690 (2006) (noting that state-of-mind hearsay evidence is not limited to situations where "the accused has alleged [a] killing was the result of accident, self-defense, or suicide" and that "a spectrum of victim declarations are admissible [under the state-of-mind exception] based on relevance and probative value to a material fact"). The testimony of Mrs. Crawford's co-worker and her boss regarding her feelings about appellant and her fear of him was relevant both to rebut appellant's claim that the shooting was accidental and to address whether Mrs. Crawford would willingly accompany or travel with appellant or agree to have sexual relations with him. Therefore, the testimony of her boss and her co-worker was admissible for the purpose of proving Mrs. Crawford's state of mind about appellant and their relationship, and the trial court did not err in denying appellant's motion to exclude this evidence.[7]

### III.

For these reasons, we hold the trial court did not err in admitting the testimony of the victim's boss and co-worker for the purpose of showing the victim's state of mind. However, we hold the trial court erred in admitting the challenged affidavit to prove the truth of its contents. We hold further that this error was harmless only in relation to the grand larceny conviction. As a result, we reverse appellant's convictions except the one for grand larceny, which we affirm. As to the convictions for rape, abduction with intent to defile, and use of a firearm in the commission of abduction, we hold the evidence including the improperly admitted affidavit was insufficient to

---

[7] Appellant does not argue that these statements were testimonial; nor does he argue that Crawford should apply to this evidence.

- 22 -

prove these offenses. Thus, we dismiss the indictments for rape, abduction with intent to defile, and use of a firearm in the commission of abduction. Because we reverse and dismiss the convictions for rape and abduction with intent to defile, which provided the basis for convicting appellant for capital murder rather than first-degree murder, appellant may not be retried for capital murder, but because appellant does not challenge the sufficiency of the evidence to prove the underlying murder, we remand for retrial on an offense no greater than first-degree murder without considering the sufficiency of the evidence to prove this offense. For the same reason, we remand for retrial appellant's conviction for use of a firearm in the commission of murder.

<u>Affirmed in part, reversed and dismissed<br>
in part, and reversed and remanded in part.</u>

Beales, J., concurring, in part, and dissenting, in part.

I concur with the majority's holding that the trial court erred in using the forfeiture by wrongdoing doctrine to admit Mrs. Crawford's affidavit for the truth of the matters asserted therein, given the United States Supreme Court's recent holding in Giles v. California, ___ U.S. ___, 128 S. Ct. 2678, 171 L.Ed.2d 488 (2008). I also concur with the majority's holding that the trial court did not err in admitting the statements of Mrs. Crawford's co-workers under the state-of-mind exception to the hearsay rule, see Clay v. Commonwealth, 262 Va. 253, 257-58, 546 S.E.2d 728, 730 (2001). However, I disagree with the majority's sufficiency analysis, and, therefore, I dissent in part from the majority opinion.

I concur with the majority's resolution of the issues related to the grand larceny,[1] rape,[2] capital murder,[3] and use of a firearm in the commission of a murder convictions. I also agree that admission of the affidavit for the truth of the matters asserted therein was not harmless error in relation to the abduction with intent to defile conviction because the affidavit could have influenced the jury's decision on that conviction. However, unlike the majority, I would reverse and remand the abduction with intent to defile conviction, as well as the related firearm charge, for retrial on the lesser-included offense of simple abduction, rather than dismiss this conviction.

---

[1] Nothing in the affidavit mentioned automobiles or theft, and appellant did not argue that the evidence was insufficient to prove that he stole his father-in-law's car.

[2] The affidavit clearly alleged a previous rape several months before the murder, which constituted inadmissible evidence of the same crime with which appellant was charged, and the evidence in the record was also insufficient to prove beyond a reasonable doubt that the sexual intercourse between appellant and the victim that apparently occurred on November 19, 2004, was not consensual.

[3] I agree with the majority that both the rape and abduction with intent to defile convictions are not supported by the evidence in the record. As these convictions form the statutorily mandated predicate offenses for the capital murder conviction, we cannot remand for retrial on capital murder, although we can remand the use of a firearm *in the commission of a murder* conviction for a new trial. Therefore, I agree that appellant must have a new trial on the lesser-included offense of first-degree murder, if the Commonwealth be so inclined.

- 24 -

Therefore, although I concur in other respects, I respectfully dissent from the majority opinion on the abduction conviction and the related conviction for use of a firearm during the commission of an abduction.

ANALYSIS

Appellant was convicted of abduction with intent to defile. As the majority found, admission of the affidavit into evidence for the truth of the matters asserted therein violated appellant's constitutional right to confront the witnesses against him, and, given the standard set by the United States Supreme Court for harmless error involving a constitutional issue, see Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710-11 (1967), that error was not harmless. Therefore, the conviction for abduction with intent to defile must be reversed. See Dearing v. Commonwealth, 259 Va. 117, 123, 524 S.E.2d 121, 124-25 (2000). If appellant had not also argued that the evidence was insufficient to prove he committed abduction with intent to defile, then we would simply remand the abduction with intent to defile conviction for a new trial. See, e.g., Owens v. Commonwealth, 216 Va. 315, 218 S.E.2d 530 (1975) (finding a certificate of analysis was improperly admitted into evidence and reversing and remanding for retrial on the original charge "if the Commonwealth be so advised"). However, appellant does argue that the evidence was insufficient to prove his abduction with intent to defile conviction. Therefore, this Court must examine the sufficiency of the evidence here to determine whether the conviction should be dismissed or remanded for a new trial.

While I agree with the majority that the evidence, viewed under the traditional sufficiency standards of deference to the fact finder and examining the evidence in the light most favorable to the Commonwealth, would not support the *intent* element of the crime of abduction *with intent to defile*, I disagree with the majority's conclusion that the evidence was also insufficient to prove the act of simple abduction. Instead, I would find that the evidence was

- 25 -

sufficient to support a conviction for the lesser-included offense of simple abduction, and so this charge should be remanded for retrial along with the associated firearm charge.

As this Court has explained previously:

> The consistent practice in Virginia, when the evidence is found insufficient to sustain a felony conviction on appeal, but sufficient to sustain a conviction on a lesser-included misdemeanor offense, has been to remand the case for retrial on the lesser-included offense.
>
> This practice is consistent with case law from other jurisdictions that holds that a post-trial finding of insufficient evidence to support a conviction requires an acquittal only as to the greater charge for which the evidence was insufficient, but does not require acquittal of a lesser-included offense adequately supported by the evidence.

Gorham v. Commonwealth, 15 Va. App. 673, 678-79, 426 S.E.2d 493, 496-97 (1993) (citations omitted). In reviewing the sufficiency of the evidence here, we should examine *all* of the evidence, including the affidavit, in the light most favorable to the Commonwealth. Hargraves v. Commonwealth, 37 Va. App. 299, 312-13, 557 S.E.2d 737, 743 (2002) ("[W]e consider all admitted evidence, including illegally admitted evidence," when assessing the sufficiency of the evidence on appeal.).

The majority's discussion of the act of abduction focuses on the evidence regarding Mrs. Crawford's intention to meet her estranged husband on the morning of November 19th. The evidence does support a conclusion that, initially, Mrs. Crawford willingly met with appellant that morning. However, that evidence does not prove that Mrs. Crawford willingly and voluntarily continued to stay with her husband that morning. In fact, additional facts in the record prove that, while they were together, the situation changed, and appellant then abducted Mrs. Crawford.

Appellant told the police that his reason for meeting his wife was to reconcile with his wife. However, Mrs. Crawford clearly did not have the same intention. The affidavit, the

preliminary protective order, and the testimony of her co-workers and her parents proved that Mrs. Crawford was not interested in reuniting with her husband. See Hodges v. Commonwealth, 272 Va. 418, 436-37, 634 S.E.2d 680, 689-90 (2006) (discussing the relevance of a victim's state of mind); Elliot v. Commonwealth, 30 Va. App. 430, 437-38, 517 S.E.2d 271, 275 (1999) (discussing state of mind). Although she asked the JDR court to dismiss the protective order, nothing in the record suggests that, by withdrawing her request for a protective order, Mrs. Crawford had forgiven her husband for all of his abuse and now wanted to reconcile with him. Many other explanations exist for the refusal to go forward with a permanent protective order. Here, although appellant alleged in his statement that they were meeting to attempt a reconciliation, the Commonwealth's evidence proved Mrs. Crawford apparently wanted to meet with her estranged husband to obtain his signature on a form that freed her father from liability on their apartment's lease, creating the strong inference that she did not intend to move back into that apartment.

Appellant had made threats and committed acts of violence against Mrs. Crawford. She was afraid that he would kill her, based on statements she included in the affidavit. Appellant himself apparently felt so unsure about their alleged reconciliation that he took a loaded gun with him when they met on the morning of November 19th. Although appellant packed a suitcase and took it with him to the motel, the motel room contained none of Mrs. Crawford's luggage – only her purse. Nothing in the room suggested she intended to go away for the weekend with her estranged husband. In fact, she had told her employer that she expected to be at work by 1:00 that afternoon, and she had a date with another man the next evening. Based on the evidence here, the jury could reject appellant's statement to the police that the spouses intended to reconcile and instead could have believed that he was lying to the police.

- 27 -

In addition, appellant's actions after shooting his wife support the jury's conclusion that appellant abducted his wife. After shooting her, instead of going into the McDonald's where he alleged the shooting occurred and asking for help, appellant removed Mrs. Crawford from the driver's seat of her car and placed her in the back seat. He then drove her away from the scene of the shooting. He did not take Mrs. Crawford directly to a hospital or to a doctor, although her desperate need for medical attention was obvious. He contacted no medical personnel or anyone else who might have been able to help her. Instead, he threw her cell phone out of the car, and he then drove to a motel in Charlottesville, preventing her from contacting anyone who might have been able to help her.

Appellant admitted to the police who arrested him in Florida that he took Mrs. Crawford to a motel and left her there alone after the shooting. At that point, according to the assistant medical examiner, Mrs. Crawford could not move her body due to the severing of her spine. Given that appellant admitted that he shot her – and Mrs. Crawford's urgent need for medical attention – the evidence proved overwhelmingly that Mrs. Crawford did not willingly leave the scene of the shooting to go with appellant to a motel. Viewed in the light most favorable to the Commonwealth, the evidence supports the jury's finding that appellant abducted his wife.

The majority opinion finds the timing of Mrs. Crawford's death is relevant to our review of the evidence of abduction on appeal. However, in his arguments to this Court, appellant has never argued that Mrs. Crawford died before they arrived at, or even started driving to, the motel. His entire argument on appeal regarding the sufficiency of the evidence to prove abduction rests upon his allegation that Mrs. Crawford was with him willingly; he makes no claim that she died before any asportation of her occurred. Therefore, I would not address the timing of Mrs. Crawford's death in our discussion of the sufficiency of the evidence here. See Rule 5A:18.

However, as the majority does address the timing of Mrs. Crawford's death, I do note various facts upon which the jury could rely to find Mrs. Crawford did not die instantly after the shooting. First, the medical examiner testified that Mrs. Crawford could have lived for up to an hour after she was shot, although he also said that she might have lived only a few minutes. As appellant testified that the shooting occurred in Charlottesville, the medical expert's testimony could support the conclusion that Mrs. Crawford was alive when they reached the motel, which was also in Charlottesville.[4] In addition, appellant told the police that his wife talked to him after the shooting, although he did not indicate more specifically when she spoke to him. Also, appellant apparently attempted to minister to Mrs. Crawford once they were in the motel room – something he would be unlikely to do if she were already dead. Appellant put her on the bed, undressed her, and put a make-shift dressing on the gunshot wound. Even if Mrs. Crawford was not alive when they reached the motel, I would find that, once appellant shot her and she was in need of medical attention, the evidence is sufficient to conclude that Mrs. Crawford did not want to take a drive to a motel in Charlottesville with the man who had just shot her and, therefore, she was abducted at the point that he drove her away from the scene of the shooting. Therefore, I would find that the evidence was sufficient to prove that Mrs. Crawford was alive when appellant, the man who shot her, forced her into the back seat of the car and then, instead of taking her to a hospital or getting some assistance anywhere, drove her away from the scene of

---

[4] The exact location of the shooting is not known. The physical evidence suggested that it occurred somewhere in or near Manassas, but appellant in his statement claimed it happened in Charlottesville. No evidence was presented to prove where the car was parked when the shooting occurred. Therefore, the actual distance between the scene of the shooting and the motel is unknown.

the shooting and any possible medical assistance to a motel in Charlottesville, thereby committing abduction of Mrs. Crawford.[5]

Finally, I find it appropriate to comment on the conclusion reached here, and in the majority opinion, that various convictions be remanded for retrial on lesser-included offenses, rather than simply remanding these convictions for resentencing on the lesser-included offenses. Based on the Virginia Supreme Court's recent decision in Britt v. Commonwealth, ___ Va. ___, ___ S.E.2d ___ (Oct. 31, 2008), we cannot simply remand for resentencing, as was done in South v. Commonwealth, 272 Va. 1, 630 S.E.2d 318 (2006), because the parties here did not concur in asking this Court for a remand for resentencing of the abduction with intent to defile conviction on the lesser-included offense of simple abduction (or for a remand for resentencing of the capital murder conviction on the lesser-included offense of first-degree murder). Therefore, as directed by the Supreme Court in Britt, I believe the appropriate result here is to remand the abduction with intent to defile conviction to the trial court for a new trial on the lesser-included offense of simple abduction and for retrial on the attending conviction for the use of a firearm in the commission of an abduction, if the Commonwealth be so advised. I also concur in the majority opinion's remand of the capital murder conviction for retrial on the lesser-included offense of first-degree murder and for retrial on the related use of a firearm in the commission of a murder conviction, if the Commonwealth be so advised.

---

[5] The indictment charged appellant with use of a firearm in the commission of an abduction, not with use of a firearm in the commission of an abduction with intent to defile, and the relevant jury instruction likewise defined the crime as use of a firearm in the commission of an abduction. The final order states that appellant was convicted of use of a firearm in the commission of an abduction. Therefore, as the predicate offense, i.e., an abduction, was proven, I would not dismiss this conviction.

## CONCLUSION

For the foregoing reasons, I respectfully concur in part and dissent in part from the majority opinion.